*In re* M.B., a Minor (The People of the State of Illinois, Petitioner-Appellant v. M.B., a Minor, Respondent-Appellant (Marion Bo. *et al.*, Respondents-Appellees)).

First District (5th Division)   No. 1—90—0854

Opinion filed September 18, 1992.

Patrick T. Murphy, Public Guardian, of Chicago (Lee Ann Lowder, of counsel), for appellant Office of the Cook County Public Guardian.

Mary Ellen Dienes, of Northfield, for appellees.

Evette J. Zells, of Chicago, for respondent Corine Bruce.

JUSTICE GORDON delivered the opinion of the court:

The public guardian, on behalf of M.B., a minor, appeals from an order of the circuit court which granted the motions of M.B.'s parents, Marion Bo. and Annie Bo., to dismiss the proceedings with prejudice. In granting the motions, the circuit court found that it lacked subject matter jurisdiction, and it required that M.B. be returned to the custody of his parents. This appeal also extends to an earlier order of the circuit court which granted the petition of the parents pursuant to section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401) to vacate a finding of neglect, an adjudication of M.B.'s wardship, and an order appointing Corine B. as the legal guardian of the child. On appeal, the public guardian contends, *inter alia,* that the circuit court erred in dismissing the proceedings and that the resultant restoration of M.B. to the custody of his parents was contrary to the child's best interests. The State and Corine

B., formerly M.B.'s legal guardian, have joined in the public guardian's appeal.[1]

The public defender of Cook County represented Corine B. in the circuit court. On appeal, however, the public defender inadvertently filed a brief on behalf of M.B.'s parents, leaving Corine B. without representation. Pursuant to a special hearing and without objection, we granted the public defender leave to withdraw its brief and itself from this appeal to avoid a conflict of interest, and we appointed separate private counsel to represent M.B.'s parents and Corine B. As we stated earlier, the latter has joined in the public guardian's appeal. On March 26, 1992, M.B.'s father, Marion Bo., addressed a letter to this court advising the court that he would terminate his participation in this appeal and not "prolong any legal attempts to maintain the guardianship" of his son. At the foregoing special hearing, the father appeared in person and was given leave to withdraw his letter without prejudice.

M.B. was born on October 25, 1977. He is not related to Corine B., and she is not related to his parents. On April 10, 1981, when he was 3½ years old, the Illinois Department of Public Aid filed a petition for adjudication of his wardship. The provisions of the petition are the basis for a finding by Judge Peter F. Costa that Corine B. perpetrated a fraud *ab initio* in this matter. The petition listed M.B.'s mother as "Ann B." and her address as "unknown," it listed M.B.'s father as "to all whom it may concern" and the father's address as "unknown," and it listed M.B.'s custodian as Corine B. of South Parnell Avenue in Chicago. The petition listed further that M.B. resided at the South Parnell Avenue address and that he was born on October 27, 1977. Finally, the petition alleged that M.B. was neglected as to the care necessary for his well-being, and that he was abandoned. See Ill. Rev. Stat. 1979, ch. 37, par. 702—4(1)(a), currently codified in Ill. Rev. Stat. 1991, ch. 37, par. 802—3(1)(a).

On April 24, 1981, Judge Costa appointed the Department of Children and Family Services (hereinafter DCFS) as M.B.'s temporary custodian and M. Leonard Goodman as M.B.'s guardian *ad litem*. On May 22, 1981, Judge Costa appointed Corine B. as M.B.'s temporary custodian. In June 1981, following a prove up, Judge Costa entered a finding of neglect and adjudicated M.B. a ward of the court. On June

---

[1]The State was originally designated as an appellee but was realigned as an appellant pursuant to its motion.

30, 1981, he entered a dispositional order placing M.B. in the custody and guardianship of DCFS.

On June 26, 1985, pursuant to a petition filed by DCFS which listed M.B.'s mother as "Annie R. Az M." and her last address as "Hong Kong," and which indicated that Corine B. was M.B.'s grandmother, Judge Costa appointed Corine B. as M.B.'s guardian.

Over two years later, on October 27, 1988, M.B.'s biological parents filed a petition pursuant to section 2—1401(c) of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401(c)) to vacate the 1981 finding of neglect and adjudication of wardship, and the 1985 order of guardianship. In the petition and supporting affidavits, the parents alleged that Corine B. had concealed the court proceedings from them during the previous seven years by furnishing false information to the authorities. They alleged further that they first learned about the proceedings on September 10, 1988, when M.B.'s father went with Chicago police to remove M.B. from Corine B.'s custody.

The hearing on the parents' petition to vacate was held before Judge Costa on various dates in 1989. During the hearing, Corine B. testified as an adverse witness that she was also known as Corine Bu. and that she had received public aid since 1951. She told the Department of Public Aid that M.B.'s mother was her (Corine B.'s) former husband's daughter, Ann B., even though this information was not true and she (Corine B.) did not then know the full name of M.B.'s mother or M.B.'s real name. She knew only that his mother's name was Ann (or Anne).

Corine B. testified that in 1982, M.B.'s mother came to take him for what was supposed to have been a brief outing but waited two years before returning him to Corine B. Corine B. testified further that she told M.B.'s mother about the court proceedings before the foregoing incident in 1982, but she also testified, "I didn't see her. How could I tell her?"

When M.B. was returned to Corine B.'s custody in 1984, she had him enrolled at school. She did not personally enroll him, and she did not know that he was registered under his real name or that the school records contained his parents' names, addresses, and telephone numbers.

Corine B. testified initially that in 1988 she told an investigator that she did not know the name of M.B.'s father, even though she had seen him at M.B.'s school in October 1986, and he had paid her his social security benefits (which she did not keep). She then retracted her testimony about telling the investigator that she did not know the name of M.B.'s father.

During the course of the adverse examination, Corine B. was shown a letter. She testified that she recognized it but "never did read" it, that she would refuse to read it and that she was unable to read it. Although it is not entirely clear from the record which letter was at issue, there is an indication that the letter was a handwritten, notarized document dated November 14, 1984, and signed by M.B.'s mother under the name, "Annie A.," in which she twice referred to Corine B. as her mother and appointed her as the "temporary legal guardian" and custodian of M.B. This document apparently would coincide with the time that M.B. was returned to Corine B.'s custody in 1984 after having been taken away for two years. It was subsequently admitted into evidence during the testimony of M.B.'s mother.

Finally, in response to a question posed by her attorney, Corine B. testified that she did not understand, and was confused by, some of the questions that she had been asked during the adverse examination.

Following Corine B.'s testimony, the parties stipulated that certain DCFS records and school records would be admissible into evidence as business records. The DCFS records dating from 1981 reflect that in 1977, three days before Corine B.'s former husband, James B., died, he brought M.B. to her. The records reflect further that M.B. was his grandson, that M.B.'s mother was James B.'s daughter by a prior marriage, and that her whereabouts were unknown. The records state that as M.B.'s step-grandmother, Corine B. was eligible to receive payments for providing M.B. with a relative foster home, and that M.B. was "doing fine" in her home, which was a Chicago Housing Authority apartment. A June 16, 1982, letter from a DCFS social worker to the Chicago Housing Authority states that M.B. was Corine B.'s step-grandson.

DCFS records dating from 1984 and 1985 consistently state that Corine B. appeared "to provide adequate love, structure, security and stability" and "good care" for M.B., and that he repeatedly expressed his desire to stay with her. The records state further that his mother's exact whereabouts "were always unknown" to DCFS, but that she went to Hong Kong after M.B. was returned to Corine B. in 1984. In 1985, DCFS devised a plan to pursue private guardianship of M.B. for Corine B.

School records dating from the two-year period of time from 1982 to 1984 when M.B.'s mother removed him from Corine B.'s custody contain his real name and the names, addresses, and telephone numbers of his parents. For example, a school record dated September 13, 1982, lists M.B.'s name as "S.M.Bo.," his mother's name as "A.A."

and their address as the same Union Avenue address that is listed for Margaret Smith, a friend to be contacted in the event of an emergency. A school record dated October 6, 1982, lists M.B.'s name as "S.M.Bo.," his mother's maiden name as "A.F.," and her then name as "A.R.A." The record states that she was his legal guardian and it lists their Orleans Street address. Once again, Margaret Smith was listed as a reference to call in the event of an emergency. Another school record dated August 8, 1983, lists several different addresses for M.B. or his mother, while another record lists M.B.'s father's name and the father's telephone number, and it lists the mother's name as "A.F." and her Sheridan Road address and telephone number.

After the parties had stipulated to the admissibility into evidence of the DCFS and school records, M.B.'s mother was called as a witness. She testified that her name was "A.R.Bo." and that it formerly had been "A.A." prior to her marriage to M.B.'s father. She testified further that M.B. was born on October 25, 1977. Following M.B.'s birth, she and his father lived together approximately three years at an address on North Kenmore Avenue in Chicago. They separated in 1980. She continued to live at the Kenmore Avenue address while working as a waitress and studying music. She had met Corine B., whom she knew as Mrs. Bu., not Mrs. B., through Margaret Smith, who attended school with Corine B.'s daughter. In December 1980, she decided to employ Corine B., whom she described as a "loving, warm person," as a 24-hour a day babysitter for M.B. but she called every day, visited every weekend, supplied his food and clothing and paid Corine B. $100 in cash every week. According to M.B.'s mother, the arrangement lasted until August 1981; moreover, Corine B. knew her as "A.A." and knew where she lived, worked, and went to school, but never told her that there was a court proceeding or that DCFS had guardianship of M.B.

She removed M.B. from Corine B.'s care from August 1981 until November 1984, because her friend, Margaret, was able to baby-sit for him then. M.B. attended school and lived with his mother on North Sheridan Road.

In October 1983, M.B.'s mother happened to meet Corine B. at a funeral for Margaret's mother. Corine B. stated that it would be best for M.B. to have 24-hour supervision. M.B.'s mother agreed because she loved Corine B. and thought of her as her own mother. In November 1984, when she returned M.B. to Corine B., the latter requested a letter stating that she (Corine B.) was her mother, apparently to satisfy housing authorities. M.B.'s mother provided the letter, and they

resumed the baby-sitting arrangement which they previously had. Corine B. again knew her address and telephone number, and both Corine B. and M.B. would call her on the telephone.

M.B.'s mother testified that she had no doubt that Corine B. was taking good care of M.B. "because I won't leave my kid with anyone." However, her plan was to have him stay with Corine B. for only one year. But she did not take him back after a year because, in her words:

"[I]f I picked him up the police would pick me up. *** [S]he [Corine B.] said that she had some type of paper on him that didn't allow me to pick the kid up, so I wanted to know what kind of papers. She said, 'Just don't bother because, you know, if you pick him up I will call the police.' "

In March 1985, M.B.'s parents got married, but they separated about one year later. M.B.'s mother's last contact with M.B. prior to her testimony occurred during the summer of 1988 when she and M.B. and his father went to a restaurant.

Contradicting her testimony that she previously had learned around 1984 or 1985 that Corine B. had a "paper" concerning M.B., she testified that she first learned in 1988 of the existence of a paper or court proceedings, when her husband's lawyer advised him to go to Corine B.'s home and "pick the kid up."

Marion Bo., M.B.'s father, testified next that for the first three years of M.B.'s life he (M.B.) lived with his parents on North Kenmore Avenue in Chicago. When M.B.'s parents separated after three years, M.B.'s father went to live with his own parents in Hanover Park, but he continued to visit M.B.

He first met Corine B., whom he knew as Mrs. Bu., in 1980. During that meeting, he wrote his Hanover Park address and his telephone number on a piece of paper, left it for M.B., and told M.B. to contact him there in the event of an emergency. He was living in Hanover Park in April 1981 (when the petition for adjudication of wardship was filed) and he continued to visit M.B. In the autumn of 1981, he saw M.B. at M.B.'s mother's apartment. As far as he knew, M.B. was living there. He did not see M.B. between the summer of 1983 and March 1985. When he married M.B.'s mother in March 1985, M.B. was living with Corine B. M.B.'s father subsequently was in "constant contact" with M.B., talking to him on the telephone and taking him to restaurants, to visit his (M.B.'s) mother at her studio, and to Hanover Park.

Early in 1986, he separated again from M.B.'s mother, but he continued to have contact with M.B. In late 1986, M.B. was troubled be-

cause he had not heard from his mother. M.B.'s father assured him that she "was not indeed dead."

In 1985, he started to receive social security benefits, and in 1987, he made Corine B. the direct payee of those benefits for M.B.

He visited M.B.'s school twice during the autumn of 1987, and he spoke with Corine B. at the school on both occasions.

M.B. stayed at his father's Hanover Park residence approximately one month during the summer of 1988. The latter then permitted Corine B. to take M.B. on a trip. When he tried to pick up M.B. after the trip, Corine B. refused to let M.B. go. M.B.'s father then sought legal counsel.

In September 1988, M.B.'s father had Chicago police accompany him to Corine B.'s home. Corine B. showed him certain documents containing the name "M.B." M.B.'s father testified that up to that time he was unaware of any court proceedings involving M.B., and he had no reason to believe that Corine B. had guardianship of M.B.

During cross-examination, M.B.'s father testified that M.B. needed someone to make day-to-day decisions for him, that he (the father) lived in the Hanover Park house from 1981 through 1988, and that there was ample room for M.B. to have lived there. Nevertheless, he (M.B.'s father) signed a paper in 1987 authorizing Corine B. to take care of M.B. The authorization, which is included in the record on appeal, is dated April 22, 1987, is notarized, contains the name and address of M.B.'s father, and states that M.B.'s father, as father and guardian, gave his consent to Corine B. to take care of his son. It states further that he would make monthly payments to her for the care of his son, who was his dependent under a social security account. He did not take custody of M.B. when he learned that M.B.'s mother was no longer having contact with M.B. Nor did he tell the hospital that treated M.B. in 1988 for injuries sustained in an automobile accident that he was responsible for M.B.'s medical care.

The mother of Marion Bo. testified that when M.B. was a baby, he stayed with her at her Hanover Park home for 1 to 1½ years. Her husband (who did not testify) took care of M.B. more than she did. M.B. was removed from her home when his parents had a disagreement. During the ensuing years, she sometimes saw M.B. on weekends, and he stayed with her during the summers of 1987 and 1988. He also stayed with her at least one week almost every summer.

During cross-examination, she testified that there was ample room in her Hanover Park house for M.B., that he had his own bed, and that she wanted to keep him, but his parents decided to place him with Corine B.

J.T. Detwyler, a probation officer assigned to the dependent-neglect division of the juvenile court's personal guardianship unit, testified that his records indicated that Corine B. was M.B.'s grandmother. He first visited them in October 1985, and she showed him the letter from M.B.'s mother. Corine B. had no information about M.B.'s father until October 1988, when she showed Detwyler the father's 1987 letter giving her custody of M.B. She did not show Detwyler the letter during a June-1988 visit. In November 1988, she told Detwyler that M.B. had been struck by a car while running away from his father, who was going to inflict physical discipline upon him. Detwyler subsequently confronted her with a different version of the circumstances surrounding the accident. She then stated that M.B. had walked in front of a car after having exited her grandson's vehicle.

During cross-examination, Detwyler testified that it would surprise him to learn that previous DCFS records disclose that Corine B. and M.B. were not related. He testified further that he made annual visits to Corine B. between 1985 and 1988, that M.B. was being well cared for, and that he never learned the reason why M.B. had walked in front of the car.

Nadine Snyder, a social worker at Michael Reese Hospital, testified on behalf of M.B. The attorney for M.B.'s parents objected to her testimony, but Judge Costa overruled the objection and observed that he would allow the testimony because M.B.'s best interest was the controlling consideration in the case.

Ms. Snyder testified that M.B. was admitted to Michael Reese Hospital in 1988 for a broken leg after having been struck by a car. He occasionally explained that he had deliberately run into the street because he and his father had argued and he was frightened. His explanations of the accident, however, were not consistent.

Ms. Snyder found M.B. to be a well-behaved child who interacted well with other children and who "took great delight" in being tutored while he was hospitalized. When he learned that his father was ill, he was concerned about what he could do to help him.

After M.B. was discharged from the hospital, he had daily appointments for bandage changes and whirlpool treatments. Ms. Snyder was impressed that M.B. and Corine B. "religiously" arrived on time for every appointment fairly early in the morning, that M.B. was clean, and that they tolerated medical delays. After M.B.'s parents filed their petition to regain custody of him, he became erratic and agitated, he visited the hospital's emergency room on three occa-

sions for anxiety attacks and he was referred for a psychiatric evaluation.

Ms. Snyder testified that M.B. was bright, but emotionally fragile, prone to sudden bursts of tears and frightened by the possibility of being returned to the custody of his parents, because "[h]e doesn't know them. He doesn't know what going with them would mean." M.B. told her that "he would kill himself if forced to move." Ms. Snyder did not think that this was a fabricated threat designed to be used in court. When asked whether it was in M.B.'s best interest to be returned to his parents, Ms. Snyder responded:

> "I don't think any unprepared change is in [M.B.'s] interest at this time. I think any sudden change at this time in any direction would be overwhelming to him. *** I think my suggestion would be an organized period of helping him sort out his own thinking and his own needs, with the adults involved to re-evaluate their own committments [sic] to this child. *** I feel that he is fragile enough and has been through enough changes, to inflict a change on him that is not well-secured, to potentially have it fall apart would be devastating. *** If you're referring to a return to his parents, these are not parents who have been parenting, and they are—they would be suddenly parents of an adolescent that they hardly know. *** [F]or the placement to then fall apart would be very difficult for him. It would be hard on any child. It would be devastating to [M.B.]."

During cross-examination, Ms. Snyder testified that she did not attempt to make contact with M.B.'s parents because Corine B. had provided proof of guardianship. She testified further that M.B. would speak about his parents in different ways at different times, and that "he is concerned about being transferred to their care when he doesn't feel he knows them.. There is some appeal to the kindness they have shown him. There has been great anxiety among [sic] visits, great anxiety." M.B. told Ms. Snyder that during the time when he was believed to be in his mother's care, "it was possibly in the care of a friend of his mother's and not with her." Ms. Snyder's impression was that M.B. had "difficult thoughts to deal with" and that he had implied that he had been sexually abused, but he was never specific or clear about the abuse.

He did not mention any past history with his father and instead spoke of him only in present terms, such as the visit during the summer of 1988. He did not say that he spent any other summer with his father.

Ms. Snyder believed that Corine B. had been cooperative and that M.B. related to her "fairly well."

Next, Corine B. testified on her own behalf that M.B. "was in diapers" when he first came into her care. At that time, Margaret Smith, who was a friend of M.B.'s mother, asked Corine B.'s daughter whether she knew anyone who, in Corine B.'s words, "could keep a little boy." After Corine B. agreed to keep the child, Margaret and M.B.'s mother brought M.B. to her. M.B.'s mother gave her some coins that she had earned as tips while working at a restaurant. Corine B. then kept M.B. continuously from the day that he was originally brought to her, until the day that he was taken away for two years. No one visited him on weekends. His mother visited him only two or three times. When he was still in diapers, a caseworker from the Department of Public Aid visited Corine B. several times and told her that the child would have to be placed with DCFS if Corine B. did not know M.B.'s real name. At that time, Corine B. did not know where to locate M.B.'s mother and she did not know who his father was. She only knew his mother's first name, "Ann."

One day M.B.'s mother came and said that she was going to take him shopping for clothing and would bring him right back. Corine B. did not see him again, however, for the next two years. Then, when M.B. was six years old, "[a] little short man from another world" returned M.B. to Corine B. The man was not M.B.'s father (whom she later met). (Other evidence in the record suggests that the man who returned M.B. to Corine B. was Mr. Azimuddin, possibly from Pakistan, to whom M.B.'s mother had been married before she married M.B.'s father.)

Corine B. testified that M.B. had lived with her since the day he was returned to her. She met his father one day at school and the latter paid her his social security benefits, which she was still receiving. After she was appointed as M.B.'s guardian, she received public aid and food stamps for him. M.B. spent two weeks with his father and grandparents in August 1988. M.B.'s father was "very friendly" until M.B.'s mother reappeared, at which time he "started acting up."

M.B.'s mother called "once in a while," but her calls were infrequent and M.B. thought that she was dead. She told Corine B. that she was at her Uncle Rocky's house, but she never disclosed where she lived, nor did she give Corine B. any more money for M.B. Corine B. testified that she (Corine B.) loved M.B. and wanted to keep him.

During cross-examination, she testified that she told the Department of Public Aid that her former husband had brought M.B. to her. She probably also told them that her former husband was the father

of M.B.'s mother. She made up M.B.'s name, because she did not know his real name; she only knew his mother's first name, "Ann." She told M.B.'s mother that she had to "give" M.B. to the court, and she asked M.B.'s mother and Margaret what his real name was, but they refused to disclose it. Her husband suggested that she give him the last name "B.," which was the same as her own surname.

After M.B. was returned to Corine B.'s care, his mother gave her "a paper"; Corine B. did not request the paper. Corine B. then enrolled M.B. in school under his real name, S.M.Bo. She testified inconsistently about whether the school records contained the names and addresses of his parents, but she testified further that she never saw the school records.

Next, M.B. testified in chambers. At the time he testified, he was approximately 11 years and 11 months old. He stated that he did not remember ever having lived with anyone before Corine B. The first time that he remembered having seen his mother was when he was six years old. During the time that she took care of him, she had a different last name, and she left him with different babysitters or friends of hers in different houses while she worked. One of those friends was Rocky.

M.B. had three brothers, but his mother "put them out" and M.B. never saw them again except for one chance meeting in a park when he was back in Corine B.'s custody. When he was back in her custody, he saw his father "off and on," but he did not see his mother, whom he saw only in court. Furthermore, he had only limited contact with his father because he (M.B.) did not want to have contact with him. M.B. spent three weeks with his father in Hanover Park during only one summer—the summer of 1987. He did not spend part of every summer with his father.

M.B. testified that he wanted to live with his "grandmother, Corine [B.]" He testified further that he knew she was not really his grandmother, that he merely called her his grandmother, and that she treated him "[l]ike a mother." He did not want to live with his real mother because they had no relationship and if she had wanted him, she would have kept him when he was "small." Nor did he want to live with his father because if the latter had wanted him, he (M.B.'s father) would have taken him before there was a court case or before DCFS became involved. When asked whether he wanted to maintain contact with his parents, M.B. answered, "No. No." He acknowledged that was a serious matter, but it was a decision that he had made on his own, without any input from Corine B. Finally, he did not want to live with his father's parents because they had adopted his father,

they consequently were not his "real grandparents" and he had no relationship with them.

If the court ruled that he had to live with his parents, he would "feel unpleasant." He "very much" wanted to stay with Corine B. because she had put him in school and had fed and clothed him, and he was doing better in school while living with her than when he had lived with his mother.

One day in September 1987, M.B.'s father came to visit him. After his father left, he (M.B.) was struck by a car and then was hospitalized. Corine B. provided the necessary information to hospital personnel. His mother did not visit him at all while he was hospitalized. His father visited him "once in a while," but his father also was hospitalized at some point.

During cross-examination, M.B. testified that he had no curiosity about his parents and never asked Corine B. about them. When he was asked what he knew about his father, he answered, "Nothing hardly. Just that he is sick. And he was in the hospital for surgery." He did not remember having written letters to his father, but he did remember having given his father some of his school work. He loved his father very much and was anxious about his father's illness, but he did not want to stay with his father because he was not sure whether his father loved him. He explained, "if he loved me, he would have kept me. *** [L]ove is when you keep your child and raise them and feed them. And send them to school. And let them grow up."

When asked what he knew about his mother, he answered, "she was a jazz singer. She had her own studio. And that she is going to marry my father. And she had many, many more men while she was seeing my father. *** Because she said—She let me stay with some of them while she went to her jass [sic] studio." When she disappeared for four or five years, he assumed that she was dead. Sometimes he called his father, who assured him that she was all right. He acknowledged that he had told the court about one month earlier that he wanted to call his parents every day, but he then "just got tired" and "didn't want to call them anymore." When asked whether his mother loved him, he replied, "I don't know. It sure doesn't seem like it."

When asked to describe Corine B., M.B. testified:

> "She is nice. She is like a mother to me. She kep [sic] me when I was sick. She took me to the doctor. She has taken care of me throught [sic] bad times when I was a child. She pushed me to and from the hospital just about ever [sic] day so I could go to school. That is the reason [I] want to be with her. Be-

cause she kept me and fed me and clothed me. Why take me away from her now?"

In addition to the foregoing testimony and records, there are various written reports in the record on appeal. We have already described the earlier records of DCFS and M.B.'s schools, and we now turn our attention to the more recent reports in the record on appeal, which we will discuss in chronological order.

A social investigation dated December 7, 1988, by the probation officer, Detwyler, states in part as follows:

"According to the minor, he states that he no longer wishes to reside in the custody of his parents as he feels that definite harm will come to him. The minor states that on several occasions, he has been physically beaten by his father and that he has no desire to enter into any type of family relationship with him. The minor also states that his mother with whom he resided for a very short period of time in his life has also had him involved in illegal activities claiming that his mother wanted him to steal money while she was a prostitute from her customers. *** [T]he minor states that he believes that his parents will, in fact, harm him if he went to reside with them. *** The minor continued to state that he did not want to reside with his parents and if he did so, he would, in fact, commit suicide. This expression was not only verbal but in a letter written by the minor dated 9/28/88."

Detwyler's report reflects that M.B.'s parents were "an interracial couple" and that they denied having harmed M.B. M.B.'s father was born in Poland on May 22, 1957, and had a "physical disability due to being stabbed while he was employed as a bartender." He was receiving social security benefits and was attending classes at a college or a junior college. M.B.'s mother was born in Texas on November 23, 1947, and she was working as a school bus driver. The report states that M.B.'s parents "appear to have a very good relationship with [M.B.] as they were able to produce letters and pictures of the minor when he was a baby." However, the report also states that M.B. was involved in an automobile accident on February 24, 1988, that he had an asthma attack requiring hospital treatment on October 28, 1988, that there were mounting contradictions in the evidence and that "[i]t appears that currently the child's involvement with both of his parents is very very stressful and is as stressful with the current court appointed guardian." The report reflects that Corine B. closely supervised M.B., but her Chicago Housing Authority apartment on South Calumet Avenue was "very disorganized," "in disarray," and in

need of "daily cleaning." The report reflects further that M.B.'s parents lived in a "well maintained *** three bedroom home" in Hanover Park owned by his father's parents.

Dr. Blanchard B. Reeb, a circuit court of Cook County Department of Clinical Services psychiatrist, examined M.B., his parents, and Corine B. pursuant to a court order. Dr. Reeb's report, dated December 22, 1988, states that M.B.'s mother married Mr. Azimuddin, who was from Pakistan, around 1974. They separated several months later. Around 1975, she met M.B.'s father, Marion Bo., who was born in Poland but grew up in the United States in the home of his adoptive parents, who were 65 and 70 years old at the time of Dr. Reeb's report.

The report discloses that when M.B.'s father was 17 years old, he joined the United States Army. He married his first wife when he was 18 years old. While stationed overseas, he drank "quite heavily" and used various illegal drugs. Following his discharge from the army, he divorced his first wife.

Between August 1979 and November 1980 he was arrested six times for "keeping a place of prostitution," but he was never convicted. He was also arrested for burglary, theft, and driving without a valid registration, and he was listed as having used six aliases, but apparently he was not convicted. M.B.'s mother was arrested for retail theft and she was listed as having used three aliases, but she was not convicted.

Dr. Reeb's report discloses that M.B.'s father had been hospitalized many times. Around 1975 or 1976, M.B.'s father was hospitalized because of his "heavy drinking and drug usage and the accompanying depression." Around 1981, he was hospitalized after having been stabbed in the back with a machete during a barroom brawl and he required a series of surgeries. In 1984, he was hospitalized in a psychiatric unit for depression. Around 1984 or 1985, he was hospitalized for a head injury after he had driven into a pole. In 1988, he was hospitalized for major depression with melancholia. He weighed approximately 400 pounds when Dr. Reeb examined him.

Dr. Reeb's report states that M.B.'s parents had poor judgment and that there was little evidence they had serious regard for the differences between right and wrong. They were friendly and cooperative, but they were, according to Dr. Reeb, "clearly quite manipulative and were not reluctant to alter the facts to fit the occasion whenever there was conflict in information or whenever it seems most convenient for their purposes."

Dr. Reeb's impressions were that Corine B. cared for M.B. from the time he was one year old, that M.B.'s father had little or no contact with M.B. until the summer of 1988, that during the early stages of M.B.'s parents' relationship M.B.'s father was acting as a "pimp" for a number of prostitutes, and that both of M.B.'s parents drank heavily and that his father also used illegal drugs, although M.B.'s father claimed to have stopped drinking. Dr. Reeb observed that M.B.'s parents had separated both before and after they married, that they remained separated until September 1988, and that they had been reunited approximately five months at the time Dr. Reeb examined them. In his report, Dr. Reeb questioned their living arrangements because they both acknowledged that M.B.'s father's parents previously had refused to permit M.B.'s mother, an African-American, to live in their Hanover Park home.

According to Dr. Reeb, M.B.'s parents had an "unstable relationship" and were "very resistant and reluctant to address themselves to the fact that they have not cared for the boy and have not had the boy in contact with them during the most important first eleven years of his life. *** They literally refuse to meaningfully address themselves to the fact that their son never really had the opportunity to get to know them as parents or as people during his most important developmental years to date."

Dr. Reeb observed that Corine B. was 63 years old and that she cared for foster children. She began to care for M.B. when he was not quite one year old. She did not then know his parents. "Margarite," a friend of M.B.'s mother, brought M.B. to Corine B. When the latter met M.B.'s mother, M.B.'s mother identified herself only as "Ann." A social worker who visited Corine B.'s other foster children told her that M.B. would be taken away from her unless he was given a name. Corine B. then named him "M.B."

Corine B. had custody of M.B. until he was about four years old. During that period, M.B.'s mother visited him only three or four times. Around 1981 or 1982, she took him away and failed to return. Corine B. did not know where he was. In 1984, Mr. Azimuddin suddenly returned M.B. to her. Mr. Azimuddin told her that M.B.'s mother had gone off with another man, that he could not locate her, and that he could not take care of M.B. himself. According to Dr. Reeb, there was evidence that M.B. had been sexually abused by his mother's boyfriends.

M.B. remained with Corine B. "until the trouble started" in 1988. Dr. Reeb noted that since the parents had filed their petition to va-

cate and to regain custody, M.B. had suffered from anxiety attacks and one acute asthmatic attack.

Dr. Reeb observed that M.B.'s relationship with Corine B. appeared to be "excellent." M.B. thought of her more as a real mother than as a foster parent. M.B. stated that she was the only one he had ever been able to depend upon and who had consistently taken care of him. He believed that she had taken good care of him and had met all of his basic needs. M.B. described his mother as "undependable" and he stated that he had "little or no meaningful relationship with her." When she took him away from Corine B., she placed him with her friend "Margarita" and visited him only once every week or two. After he was returned to Corine B., he had no contact with his mother for five years, until September 1988, when his father took him to meet her at a restaurant. The only other times that M.B. saw her were in court. According to Dr. Reeb, M.B. "sincerely states that he doesn't really know his mother at all."

M.B. told Dr. Reeb that he "really had seen nothing of his father *** until the end of the year 1987." M.B. also told Dr. Reeb that at one time he was afraid of being punished by his father and therefore he (M.B.) deliberately stepped in front of an oncoming car, fracturing his leg. We note that there is a conflicting version of the automobile accident in Detwyler's December 7, 1988, report. M.B. told Dr. Reeb that he lived with his father and paternal grandparents for one month during the summer of 1988.

In Dr. Reeb's opinion, "the parents' problems both individually and together in their relationship are too severe to permit them to form any stability and they are both to [sic] resistant to treatment to even suggest that there could be any improvement." Noting that visitation had been destructive to M.B., Dr. Reeb recommended that visitation be at M.B.'s request and:

> "If at the end of a year's time these two parents show no evidence of an ability to resolve their differences or to form any stable basis upon which one might project that they have the capability for caring for this boy, the examiner would strongly suggest that parental rights be permanently terminated. In reality there is little basis for a parent-child relationship to have been built or to exist at the present time, the only meaningful relationship that [M.B.] has ever known has been with [Corine B.] who has cared for him throughout most of his life time. The examiner would urgently recommend that this boy be allowed to remain in his present setting where he seems to be progressing rather well. The only question the examiner has arises from

some reports in the record which suggests [*sic*] that there is disarray in the current home of [Corine B.]. However there is little evidence to date that this has had any destructive effect on [M.B.'s] development at this point."

Finally, Dr. Reeb recommended individual therapy for M.B. as well as extension of his guardianship with Corine B. until he reached the age of 21.

A report dated June 21, 1989, from Dr. Leonard Weiss, a Michael Reese psychiatrist who interviewed M.B. and Corine B., discloses that since initiation of the custody proceedings, M.B. had suffered from anxiety attacks and had threatened to commit suicide if returned to the custody of his parents. He suffered one of his anxiety attacks and he required emergency room treatment following a telephone conversation with his mother. He threw himself or ran in front of a car and broke his leg after his father threatened to beat him. We note again that the earlier report by the probation officer, Detwyler, contains a different version of the circumstances surrounding the accident.

Dr. Weiss' report reflects that M.B.'s parents might have been "street persons," that his mother might have been a prostitute and that his father might have been her "pimp." When M.B. was three or four years old, he was "stolen" from Corine B. by his mother, who then might have placed him with someone else. When he was returned to Corine B., there was a "crusty lesion on his penis," so she took him to a doctor. Dr. Weiss observed that Corine B. and Nadine Snyder reported that M.B. had stated at various times that the lesion was the result of sexual abuse perpetrated on him by his mother and her boyfriends, Mr. Jim and Mr. Rocky. M.B. denied having made such statements, but he had episodes during which he imagined that his mother, Mr. Jim, or Mr. Rocky were "doing something" to him.

Dr. Weiss reported that Corine B. had been taking care of the children of street people and prostitutes for years. She took custody of M.B. when he was less than one year old, after his mother could no longer afford to pay another woman who previously had taken care of him. When M.B. was two or three years old, Corine B. applied for and received public aid for him. She did not know his last name and she told public aid personnel that it was "B."

Dr. Weiss reported that Corine B. "seemed hesitant" to discuss M.B.'s parents because they had warned her, "You better watch your back old woman." However, she did tell Dr. Weiss that during the first few years of M.B.'s life, his father never visited him and his mother rarely visited, spending little time with him when she did visit. When they reappeared in his life in 1988, he was struck by a car

and he suffered psychiatric symptoms. According to Dr. Weiss, M.B.'s "psychiatric symptomatology over the last year corresponds to the reappearance of his parents in his life after many years of absence," and "he continues to be at risk for suicide." The treatment recommendations made by Dr. Weiss included "[c]ontinued placement with [Corine B.] with occasional well-planned and supervised visits to parents."

On September 14, 1989, Judge Costa granted M.B.'s parents' section 2—1401 petition to vacate. Judge Costa observed that he had evaluated the credibility of the witnesses and had resolved the inconsistencies in the evidence. He described the case as "excruciatingly difficult" and leading to "a conclusion which is not totally harmonius [*sic*]." He observed that three issues were involved beyond the usual issues of due diligence and a meritorious defense which are raised by a section 2—1401 petition: (1) a custody dispute which implicated the best interest of M.B., (2) *laches*, and (3) fraud. After observing that the doctrine of *laches* can operate to bar parental rights, Judge Costa stated that if only the first two issues (best interest and *laches*) were involved, "it would be relatively simple to arrive at a conclusion, and I don't think I need state what that conclusion would be. However, there is a third issue involved, and that is the existence or nonexistence of fraud." He was satisfied that the evidence clearly and convincingly established that Corine B. had perpetrated a fraud *ab initio* upon the court and all of the State authorities and agencies involved. He stated that he was "keenly aware of" M.B.'s position but could not "allow a wrongdoer [Corine B.] to benefit from the act of wrongdoing." He then ruled:

> "[A]ll of the findings entered in this case are void *ab initio*. The finding of neglect is void. The adjudication of wardship is void. The establishment of guardianship both in DCFS and in [Corine B.] are void, and they will therefore be vacated.
>
> Now, that leaves us in a position where we were at the time that this petition was filed; allegedly that parents are neglectful of [M.B.]. Needless to say, anyone can file a petition, and that is where we find ourselves at this juncture."

When the assistant State's Attorney observed that he would take "a cue from" the court's comments that it would be in M.B.'s best interest to remain in the custody of Corine B., Judge Costa responded:

> "I cannot appoint [Corine B.] temporary custodian. I think the young man has done relatively well with her, not withstanding that. What I will do is appoint Gary T. Morgan [of DCFS] tem-

porary custodian with right to place. If they see fit to place the young man there, that's them."

The assistant public guardian then made an oral motion to order DCFS to place M.B. with Corine B. based on the evidence regarding his best interest. The trial judge responded:

"I make this decision based on the young man's best interest. That will be allowed. DCFS is the temporary custodian."

The assistant public guardian then summarized the order as "[t]emporary custody with Gary T. Morgan, and minor to be placed with [Corine B.]" The parents were permitted to have visitation, supervised by DCFS.

At a September 20, 1989, status hearing, the attorney for M.B.'s parents argued that M.B. should be placed in "a neutral setting" and that it would be "impossible" for Judge Costa to make an "honest" determination of M.B.'s best interest. Judge Costa observed that M.B.'s parents had the right to a temporary custody hearing to determine whether there was probable cause for the neglect petition, and he then recused himself from the case, stating, "I don't think I can maintain any type of objectivity. *** And as far as the placement of the young man is concerned, I'm not going to disturb that at this time *** ."

The case was then assigned to Judge R. Morgan Hamilton, who ordered a diagnostic evaluation and a social investigation. We will discuss the diagnostic evaluation by Hephzibah Children's Association later in its proper chronological place. The social investigation dated October 25, 1989, by probation officer Detwyler, disclosed that Corine B.'s apartment was in some disarray but was "adequately furnished and the housekeeping standards were fair." It further disclosed that M.B. received social security benefits from his father, while his mother was a school bus driver as well as a licensed beautician. Their combined income appeared to be "sufficient to support the family."

On November 1, 1989, M.B.'s parents filed two motions to dismiss the 1981 petition for adjudication of wardship. One motion was filed pursuant to section 2—615 of the Code of Civil Procedure, and the other was filed pursuant to section 2—619. Ill. Rev. Stat. 1989, ch. 110, pars. 2—615, 2—619.

In the section 2—615 motion, M.B.'s parents alleged that the petition for adjudication of wardship should be dismissed because it contained fraudulent information about M.B.'s name, his birthday and Corine B.'s status as his custodian, and it failed to list correct names and addresses for M.B.'s parents. They alleged further that Corine B. had furnished the fraudulent information to the Department of Public

Aid and that Judge Costa had found that she had indeed committed fraud. They concluded that the petition for adjudication of wardship was "unreliable on its face and not curable" because it was based on fraud *ab initio*.

In the section 2–619 motion, M.B.'s parents alleged that the petition for adjudication of wardship should be dismissed pursuant to the principle of *res judicata* and because Judge Costa's finding of fraud was "an affirmative matter defeating the adjudication" of the 1981 petition.

The public guardian filed a response to the motions to dismiss. With respect to the section 2–615 motion, the public guardian responded that whether M.B. was neglected and whether it was in his best interest to be adjudged a ward of the court "must be decided regardless of misinformation, which could in fact be easily corrected." The public guardian observed that the names, addresses, birth dates, and custodial relationship of M.B. to Corine B. were not the dispositive considerations, that the 1981 petition properly pleaded that M.B. was neglected, that the claim that some allegations in the petition were false was not a proper assertion for a motion to dismiss, and that any misinformation could be corrected. With respect to the section 2–619 motion, the public guardian observed that Judge Costa's ruling was not based on the merits of the neglect petition and that the ruling consequently lacked any preclusive effect to bar further proceedings.

On November 2, 1989, Judge Hamilton ordered the diagnostic evaluation to be conducted at Hephzibah Shelter in Oak Park, Illinois, and M.B. was placed in the shelter on November 14, 1989.

On January 4, 1990, M.B. underwent psychological testing. A report by Gail Kaplan, a registered psychologist, discloses that M.B. had "stated firmly and repeatedly" that he wanted to return to Corine B.'s care. He did not want to be placed with his parents, who he said did not love him, never took care of him, and left him. Gail Kaplan observed that M.B. was depressed, and she recommended that he be placed with a group home. She stated that "[p]remature placement with either of [his] natural parents is apt to elicit increases in [his] oppositional and acting out behavior. Replacement with [Corine B.] appears to be out of the question at the present time." (She did not explain the latter remark.) She recommended group home placement for M.B. and psychotherapy for him as well as his parents and Corine B. so he could "ultimately be reunited with his parents." She concluded by describing M.B. as an "interesting, bright, and charming child."

A "daily living staffing" report dated January 10, 1990, and prepared by nine workers from the Hephzibah Shelter where M.B. was placed on November 14, 1989, states that M.B. "clearly has a very loving relationship with his 'foster mother.' He is beginning to accept his biological mother but is still contemptuous of his biological father." At that time, his projected discharge date from the shelter was February 14, 1990.

A social assessment report dated February 16, 1990, and prepared by a social worker from the Hephzibah Children's Association, discloses, as we previously noted, that M.B. was placed at Hephzibah Shelter in Oak Park on November 14, 1989. The report states that M.B. was in his mother's custody and care from September 1982 to November 1984, that she regularly visited him on weekends when he resided with Corine B., and that she regularly paid Corine B. for his care. M.B. threatened to commit suicide if required to reside with his parents. He was accepted at the shelter "contingent upon being cleared by [the shelter's] consulting psychiatrist as presenting no suicide risk." The report reflects that Dr. Lilian Spigelman determined that there was no suicide risk unless M.B. were placed with one or both of his parents.

According to the Hephzibah report, all of the parties agreed that Corine B. had been M.B.'s primary caretaker and emotional parent for at least the preceding five years and that M.B. had strong attachments to the other children in Corine B.'s home. He indicated that he would like to stay with her but would reluctantly accept placement at Hephzibah.

The report states that M.B. "had some level of positive relationship" with his parents and "a basis of attachment upon which we could build." M.B.'s parents "produced numerous letters and school reports from [M.B.], indicating on-going contacts and a sense that he regarded them as parents." Two handwritten letters are reproduced in the report. M.B. signed both as "S.," not "M." The one dated September 11, 1987, was to his grandparents and his father. In that letter, M.B. stated that he loved them all and missed them even though he had just been there several days earlier. The other letter, dated May 25, 1988, was to his father. In that letter, he stated that he loved his father and he expressed concern for his health.

The Hephzibah report discloses that visits between M.B. and his parents began during the week of December 18, 1989, and that:

"In the ensuing weeks, the relationship between [M.B.] and his parents, particularly his mother, began to develop in a positive direction. *** [M.B.] has begun to acknowledge that his mother

is a different person, emotionally and insofar as parenting skills, than she was when he was with her six years ago. [M.B.'s] relationship with his father remains, for the most part, estranged. Yet, it is clear that [M.B.] has some emotional investment in both parents, and that this should be encouraged to develop over time."

The report continued that M.B. "appeared to be enthused" about being at Hephzibah, given the "limitations at [Corine B.'s] home, going to bed as early as 6:30 or 7 p.m. on weekdays, and rarely being allowed to leave the apartment because of high crime and harassment by older youths in the community." When Corine B. visited M.B. at Hephzibah Shelter in Oak Park, M.B. treated her as "an elderly grandmother with diminished capacity from her earlier parenting status."

The report discloses that while M.B. was at the shelter, his father was hospitalized for several weeks in a psychiatric unit. During his absence, M.B. reportedly made progress in communicating with his mother. However, there still were "considerable emotional barriers of effectively reunifying [M.B.] with his parents." The report recommended M.B.'s continued placement in a "neutral structured group home setting." The report reflects that a referral process had been initiated with the Boys' Hope Program in Evanston, Illinois, a non-DCFS program, and that a decision was expected in March 1990.

A February 16, 1990, report by Lilian Spigelman, M.D., discloses that M.B. had been in individual psychotherapy since November 1989. Initially, he "threatened suicide at the mere mention that reunion with [Corine B.] may not be in his best interests." Dr. Spigelman described M.B. as "angry," "anxious," and "mistrustful of adults." She reported that he had "presented some material" which caused her "to suspect that he has been neglected and possibly sexually abused during the short period of time that he was in the care of his biological mother." Dr. Spigelman recommended that M.B. be placed in a "neutral, structured group home" and that he continue his psychotherapy.

On February 21, 1990, Judge Hamilton dismissed the petition for adjudication of wardship. She stated:

"This Court is satisfied that once there has been a finding that a petition for adjudication of wardship is grounded in fraud, then that finding is jurisdictional and the petition cannot stand. [O]nce the fraud is brought to the Court's attention the petition must be dismissed.

This Court finds that Chapter 110 Section 2–619A1 [sic] is controlling. And that this Court does not have jurisdiction of

the subject matter, of the action by virtue of the finding that a fraud has been perpetrated upon the Court [*ab initio*]. And that the defect cannot be removed. The fraud cannot be cured. The fraud permeates the entire proceeding. Fraud [*ab initio*] cannot be amended out of the petition that is grounded in fraud.

This Court further finds that Chapter 110 Section 2—619A4 [*sic*] is applicable. And therefore the Court orders the following:

One: That the minor [M.B.] is returned to the care of both parents.

Two: That temporary custody is vacated.

Three: That the petition is dismissed with prejudice."

M.B., the State, and Corine B. have appealed from the foregoing order as well as from Judge Costa's finding of fraud. They contend that Judge Costa's finding of fraud contravened the manifest weight of the evidence, but that even if Corine B. perpetrated a fraud, it did not warrant dismissal of the proceedings by Judge Hamilton because Corine B. was a witness, not a party, to the proceedings. They contend further that the doctrine of *laches* should have barred the assertion of parental rights in this case. Finally, they contend that Judge Hamilton erred in failing to consider M.B.'s best interests prior to dismissing the proceedings.

A special hearing which this court subsequently held on April 7, 1992, to realign the attorneys due to the public defender's confusion concerning representation, and a special status report which the public guardian filed with this court on May 14, 1992, disclosed that M.B. has resided at Boys' Hope, a Jesuit facility in Evanston, Illinois, since March 23, 1990. It was further disclosed that he is doing well there, that he is happy there, and that he would like to stay there until he graduates from high school. The status report states that he has received a scholarship, through Boys' Hope, to attend Loyola Academy in Wilmette, Illinois.

■■ Turning initially to Judge Hamilton's order, we are satisfied that there was no impediment to subject matter jurisdiction in this case. The Illinois Constitution states in part:

"Circuit Courts shall have original jurisdiction of all justiciable matters ***." (Ill. Const. 1970, art. VI, §9.)

We recently observed that subject matter jurisdiction is:

" 'the power to adjudge concerning the general question involved, and if a complaint states a case belonging to a general class over which the authority of the court extends, the juris-

diction attaches.' [Citations.] In Illinois, the circuit courts have original jurisdiction of all justiciable matters." (*In re W.D.* (1990), 194 Ill. App. 3d 686, 691, 551 N.E.2d 357.)

(See also *In re Marriage of Hostetler* (1984), 124 Ill. App. 3d 31, 34, 463 N.E.2d 955.) Entry of a finding of abuse, neglect, or dependency is jurisdictional. (*In re Shawn B.* (1991), 218 Ill. App. 3d 374, 380, 578 N.E.2d 269.)

> "The language of the Act clearly exhibits the legislative intent that only a finding of either abuse, neglect or dependency must be specifically noted or recorded in the trial court's findings. This finding is jurisdictional and without it the trial court lacks jurisdiction to proceed to an adjudication of wardship. [Citation.] No other step under the Juvenile Court Act is jurisdictional. Moreover, once a minor is found to be either abused, neglected or dependent and placed in the custody of DCFS, the circuit court maintains jurisdiction over the case." *In re Shawn B.*, 218 Ill. App. 3d at 380.

This action was initiated by the Department of Public Aid pursuant to its claim that the parents had neglected and abandoned M.B. Jurisdiction was acquired through the petition alleging neglect by the parents. Judge Costa found that M.B. had been neglected. After he vacated that finding, he placed M.B. in the custody of DCFS with permission to place the child with Corine B. Corine B.'s misrepresentations did not negate the claim of parental neglect, which remained notwithstanding the misinformation that she supplied. Thus, the core of the court's jurisdiction was not predicated upon Corine B.'s misrepresentations but rather upon the Department of Public Aid's charges of neglect. (See *In re Shawn B.*, 218 Ill. App. 3d 374, 578 N.E.2d 269.) Judge Hamilton consequently erred in dismissing the proceedings pursuant to section 2—619(a)(1) of the Code of Civil Procedure. Ill. Rev. Stat. 1989, ch. 110, par. 2—619(a)(1).

We believe that Judge Costa's unfortunate use of the term "void *ab initio*" may have contributed to Judge Hamilton's erroneous conclusion that the circuit court lacked subject matter jurisdiction. An order is rendered void only by lack of jurisdiction, not by error or impropriety. (*Vulcan Materials Co. v. Bee Construction* (1983), 96 Ill. 2d 159, 165, 449 N.E.2d 812; *Johnston v. City of Bloomington* (1979), 77 Ill. 2d 108, 112, 395 N.E.2d 549; *McMann v. Pucinski* (1991), 218 Ill. App. 3d 101, 107, 578 N.E.2d 149.) Fraud can render a judgment void, but not all fraud can do so. (*Johnson v. Hawkins* (1972), 4 Ill. App. 3d 29, 32, 280 N.E.2d 291.) There is a difference between fraud that confers only colorable jurisdiction upon the court and fraud that

occurs after the court's valid acquisition of jurisdiction; only the former type of fraud will render a judgment void. (*Schwarz v. Schwarz* (1963), 27 Ill. 2d 140, 144-45, 188 N.E.2d 673.) The latter type of fraud, fraud that occurs after jurisdiction has been acquired, will render the court's orders voidable, but not void for lack of jurisdiction. (*Vulcan Materials Co. v. Bee Construction*, 96 Ill. 2d at 165; *In re Marriage of Noble* (1989), 192 Ill. App. 3d 501, 509, 548 N.E.2d 518; *James v. Chicago Transit Authority* (1976), 42 Ill. App. 3d 1033, 1034-35, 356 N.E.2d 834; *Johnson v. Hawkins*, 4 Ill. App. 3d at 32.) Fraudulent concealment, for example, renders a court's orders voidable, not void. *In re Application of the County Treasurer & ex officio County Collector* (1990), 194 Ill. App. 3d 721, 726, 551 N.E.2d 343.

In the present case, Judge Hamilton concluded that Corine B.'s fraud nullified the subject matter jurisdiction of the court. However, any fraud on the part of Corine B. did not nullify the subject matter jurisdiction of the court, because it did not relate to the circuit court's power to hear and adjudicate a child neglect case. It related instead, for example, to the name and possibly the birth date of the child, the identities of his parents, and the pendency of the proceedings in the circuit court. These types of fraud are collateral to the jurisdictional basis of the action and do not account for the rescission of parental custody. At best, they would have an impact upon the right of Corine B. to be appointed to act as the child's guardian or foster parent once parental custody is rejected. Corine B.'s fraud, in short, rendered the orders entered by Judge Costa prior to September 14, 1989, voidable, but not void. It consequently was incorrect for Judge Costa to reason that Corine B.'s fraud rendered his previous orders void, and it was incorrect for Judge Hamilton to conclude that Corine B.'s fraud nullified the subject matter jurisdiction of the court.

■ In addition, since we conclude that Judge Costa was in error in determining that the misrepresentations of Corine B. rendered his orders "void," it was incorrect for Judge Hamilton to dismiss the proceedings pursuant to section 2—619(a)(4) of the Code of Civil Procedure, which authorizes dismissal when "the cause of action is barred by a prior judgment." (Ill. Rev. Stat. 1989, ch. 110, par. 2—619(a)(4).) Here, the alleged "prior judgment" would have been Judge Costa's finding that his previous orders were "void," a conclusion which we have determined to have been erroneous. Since Judge Costa erred in finding that his earlier orders were "void," Judge Hamilton concomitantly erred in following that finding.

Moreover, before a judgment can have preclusive effect, it must be "a final judgment on the merits. [Citations.] A judgment is final if

it determines the litigation on the merits so that if affirmed the only thing remaining is to proceed with the execution on the judgment." (*Relph v. Board of Education of DePue Unit School District No. 103* (1981), 84 Ill. 2d 436, 441, 420 N.E.2d 147.) The gist of Judge Costa's September 14, 1989, order was (1) to vacate the adjudication of wardship, the finding of neglect, and the guardianship appointment based on an ancillary matter, the commission of fraud by Corine B., and (2) to place M.B. in the temporary custody of DCFS and in the physical custody of Corine B. pending a redetermination of the issues pertinent to wardship and neglect. Given these circumstances, Judge Costa's order was neither a final judgment nor an adjudication on the merits, and it did not serve to bar subsequent proceedings.

■ While Judge Costa was in error in his determination that the orders were void rather than voidable as a result of Corine B.'s misrepresentations, Judge Costa's finding in granting the section 2—1401 petition that Corine B.'s misrepresentations were fraudulent was not against the manifest weight of the evidence, contrary to the contention of the public guardian, Corine B., and the State. Nor was the granting of the section 2—1401 petition an abuse of discretion. In section 2—1401 proceedings (Ill. Rev. Stat. 1991, ch. 110, par. 2—1401), evaluation of the credibility of the witnesses is for the trier of fact, and its judgment will not be disturbed on appeal unless it contravened the manifest weight of the evidence. (*Uptown Federal Savings & Loan Association v. Kotsiopoulos* (1982), 105 Ill. App. 3d 444, 451, 434 N.E.2d 500; *Collins v. Prestige Casualty Co.* (1977), 54 Ill. App. 3d 762, 765, 370 N.E.2d 103.) The "quantum of proof" required to sustain a section 2—1401 petition is a preponderance of the evidence. (*Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 221, 499 N.E.2d 1381.) Whether to grant a section 2—1401 petition is within the sound discretion of the trial court, and a court of review will not disturb the decision of the trial court in the absence of an abuse of discretion. *Smith v. Airoom, Inc.*, 114 Ill. 2d at 221; *In re Marriage of Oldham* (1991), 222 Ill. App. 3d 744, 754, 584 N.E.2d 385.

The testimony disclosed that Corine B. fabricated M.B.'s name. She, in fact, gave him her own surname, which was a false statement of material fact and which created the false impression that they were related. She also told the Department of Public Aid and DCFS that M.B.'s mother was the daughter of her ex-husband, that her ex-husband was M.B.'s grandfather, that she was M.B.'s step-grandmother, and that her ex-husband originally had placed M.B. in her care. The 1985 guardianship petition stated that she was M.B.'s grandmother. These assertions were material in that they conveyed the false impression that Corine B.

and M.B. were related. Corine B. testified that she knew the foregoing statements and the name she gave M.B. were false. There was some complicity between her and M.B.'s mother with respect to the 1984 letter, which falsely referred to her as the mother of M.B.'s mother. She gave the child's false name and other false information to the Department of Public Aid and DCFS, the circuit court, and possibly the Chicago Housing Authority with the intent that they bestow various benefits upon her and M.B., whether public aid, food stamps, an order of guardianship, or subsidized housing. Consequently, we cannot say that it was against the manifest weight of the evidence for Judge Costa to find misrepresentations on the part of Corine B. (*Smith v. Kurtzman* (1988), 176 Ill. App. 3d 840, 846, 531 N.E.2d 885.) But as we previously noted, these misrepresentations did not divest the court of its subject matter jurisdiction because they were not related to the charges of parental neglect; rather, they were relevant to the award of custody to Corine B.

■ Nor was it against the manifest weight of the evidence for Judge Costa to make the implicit finding that there was fraudulent concealment by Corine B., which tolled the two-year limitations period that otherwise would have barred M.B.'s parents from filing their section 2—1401 petition in 1988, more than two years after the 1985 guardianship order. Corine B.'s failure to disclose to M.B.'s parents the existence of the court proceedings, coupled with her misrepresentations as to the child's name and her relationship with the child, would suffice to support the court's implicit determination of concealment. Given the circumstances, it was not an abuse of discretion for Judge Costa to make an implicit finding that fraudulent concealment on the part of Corine B. tolled the two-year limitations period prescribed by section 2—1401. (*In re Application of the County Treasurer & ex officio County Collector* (1990), 194 Ill. App. 3d 721, 725, 551 N.E.2d 343; *In re Marriage of Halas* (1988), 173 Ill. App. 3d 218, 223-24, 527 N.E.2d 474.) Accordingly, we disagree with the public guardian's contention that it was an abuse of discretion for Judge Costa to grant the section 2—1401 petition, but we agree that the court's subject matter jurisdiction was not divested.

Closely related to the question of fraudulent concealment is the question of *laches*. The public guardian, Corine B., and the State contend that the section 2—1401 petition was barred by the doctrine of *laches*. (See generally *Tully v. State* (1991), 143 Ill. 2d 425, 432, 574 N.E.2d 659.) However, in view of the fraudulent concealment on the part of Corine B., the *laches* doctrine is not applicable here. Furthermore, in cases where *laches* operated to preclude the assertion of parental rights, adoptions had occurred and the doctrine of *laches* was applied to preserve the stability of the family unit. (See *In re Adoption of Miller*

(1982), 106 Ill. App. 3d 1025, 1030-33, 436 N.E.2d 611; *Rodriguez v. Koschny* (1978), 57 Ill. App. 3d 355, 361-62, 373 N.E.2d 47.) By way of contrast, Corine B. did not adopt M.B.; rather, she provided him with what essentially was a foster home. Furthermore, the parents' delay in this case will not disrupt or materially prejudice any stable family relationship, because M.B. no longer lives with Corine B. He currently resides at the Boys' Hope facility in Evanston, where he is doing well. We decline to apply the doctrine of *laches* here. See *Eckberg v. Benso* (1989), 182 Ill. App. 3d 126, 133, 537 N.E.2d 967.

Since as previously discussed, the subject matter jurisdiction of the trial court has not been divested, this matter must be remanded to the trial court to reevaluate the custodial rights to M.B. in a manner that best protects the best interests of the child.

The court is obligated to "ensure that a dismissal of a petition to adjudicate wardship is in the best interests of the minors, their family, and society." (*In re James J.* (1989), 193 Ill. App. 3d 75, 80, 549 N.E.2d 834, *aff'd sub nom. In re J.J.* (1991), 142 Ill. 2d 1, 566 N.E.2d 1345.) This court recently observed:

> "Upon a petition for restoration of a minor to the custody of the parents the issue that singly must be decided is the best interest of the child. [Citation.] Indeed, this is true in all guardianship and custody cases. * * *

> * * *

> * * * In custody cases, a child's best interest is and must remain inviolate and impregnable from all other factors, including the interests of the biological parents." (*In re Ashley K.* (1991), 212 Ill. App. 3d 849, 879, 571 N.E.2d 905.)

Furthermore, section 1—2(3)(c) of the Juvenile Court Act of 1987 states:

> "The parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the best interests of the child." (Ill. Rev. Stat. 1991, ch. 37, par. 801—2(3)(c).)

Section 2—31(2) of the Act states in part:

> "Whenever the court finds that the best interests of the minor and the public no longer require the wardship of the court, the court shall order the wardship terminated and all proceedings under this Act respecting that minor finally closed and discharged." Ill. Rev. Stat. 1991, ch. 37, par. 802—31(2).

■ Although M.B.'s parents will have an opportunity on remand to present evidence to the contrary, the evidence already of record if it remains unrebutted compels the conclusion that the placement of M.B. in his parents' custody would not be in his best interest. There were indica-

tions that M.B.'s parents previously had been involved in prostitution and drug and alcohol abuse. Although the source was not totally ascertainable, there was some indication that M.B. may have been sexually abused while in his mother's custody. He testified that he saw his mother put his brothers out and that he never saw them again except for one chance sighting in a public park. Various sources disclose that when his parents filed their section 2—1401 petition seeking to regain his custody, he made repeated suicide threats, he was struck by a car and he suffered from attacks of asthma and anxiety, requiring emergency room treatment. He adamantly opposed being restored to the custody of his parents and instead expressed a desire for visitation.

Dr. Reeb, who interviewed everyone involved, reported that M.B.'s parents had an unstable relationship and that they had no compunctions about manipulating the facts to suit their purposes. Dr. Reeb strongly suggested the future termination of parental rights. Dr. Reeb and Dr. Weiss agreed that M.B. should remain in the custody of Corine B. Nadine Snyder testified that M.B.'s parents had not been parenting and that it would be devastating for him to be placed in their custody. Gail Kaplan recommended that M.B. be placed in a group home. The Hephzibah report reflects that there was a basis for building a relationship between M.B. and his parents, but there would be a suicide risk if M.B. were placed with one or both of them. The reports of Hephzibah and Dr. Spigelman recommended that M.B. continue to reside in a neutral group home.

Therefore, on remand, the circuit court must be mindful of the serious allegations against M.B.'s parents as well as the fact that M.B. has been doing well at Boys' Hope in Evanston since March 1990. Moreover, since the best interests of the child must be of paramount concern, the circuit court should not rule out the custodial eligibility of Corine B. despite her misrepresentations, which we do not condone. However, given that M.B.'s present status at Boys' Hope appears to be satisfactory, it should, if possible, be maintained.

The order entered by Judge Costa on September 14, 1989, granting the section 2—1401 petition is affirmed with the clear caveat that his previous orders were at best voidable, not void; the order entered by Judge Hamilton on February 21, 1990, is reversed; and the cause is remanded.

Orders affirmed in part; reversed in part and cause remanded.

McNULTY, P.J., and LORENZ, J., concur.