840 N.E.2d 1216 (2005)
217 Ill.2d 306
298 Ill.Dec. 781
In re D.S., a Minor (The People of the State of Illinois, Appellee,
v.
Iva Sue Hollis, Appellant).
No. 99991.
Supreme Court of Illinois.
December 1, 2005.
*1217 Robert E. McIntire, Public Defender, Steven L. Blakely, of Acton & Snyder, L.L.P., Danville, and Kimberly Edwards, Rossville, for appellant.
Lisa Madigan, Attorney General, Springfield (Gary Feinerman, Solicitor General, John P. Schmidt, Assistant Attorney General, Chicago, of counsel), for the People.
*1218 Chief Justice THOMAS delivered the opinion of the court:
Respondent, Iva Sue Hollis, gave birth to her son, D.S., in a Crawfordsville, Indiana, hospital. The next day, the State filed a petition for adjudication of wardship in the circuit court of Vermilion County, Illinois. The circuit court adjudicated D.S. a neglected minor and made him a ward of the court. Respondent appealed, arguing that the circuit court lacked subject matter jurisdiction and that its neglect finding was against the manifest weight of the evidence. The appellate court affirmed (354 Ill.App.3d 251, 293 Ill.Dec. 691, 828 N.E.2d 1189), and we granted respondent's petition for leave to appeal (177 Ill.2d R. 315(a)).

BACKGROUND
In 2003, respondent became pregnant with D.S. At that time, respondent lived in Hoopeston, Illinois, and had eight children. The two youngest children lived with their father in Tennessee. Respondent's remaining six children were wards of the State of Illinois, per a 2001 neglect finding. During her pregnancy, respondent asked her Department of Children and Family Services (DCFS) caseworker, Jacqui Walters, what would happen if she had her baby here in Illinois. Walters responded that it would be up to the DCFS investigative unit to determine whether the baby should be taken into DCFS custody. Afraid that DCFS would take custody of this child as well, respondent began making plans to move to Tennessee.
On March 1, 2004, respondent saw her obstetrician, Dr. Suzanne Trupin, at a clinic in Champaign. Dr. Trupin told respondent to return the next day, and respondent did so. At the March 2, 2004, appointment, Dr. Trupin told respondent to report immediately to Covenant Hospital in Champaign, as the birth of her baby was imminent. Instead, respondent got in her car and headed for Tennessee. Respondent made it as far as Crawfordsville, Indiana, before the contractions became too much to bear. Respondent checked herself into a local hospital, where she gave birth to D.S. that night.
On March 3, 2004, Amy West from the Indiana Child Welfare Service called the Hoopeston police. West explained that hospital personnel in Crawfordsville were concerned because respondent, who had given birth the day before, could not provide a local address, saying only that she was from Hoopeston. The Hoopeston police were familiar with respondent, as Dr. Trupin's office had called them the day before after respondent failed to report to Covenant Hospital as instructed. The police then informed West that termination proceedings were pending in Illinois as to six of respondent's children. At this point, West contacted Jacqui Walters at DCFS.
Walters, in turn, contacted the Vermilion County State's Attorney's office, which immediately filed a petition for adjudication of wardship in the Vermilion County circuit court. The State's petition alleged that D.S., who was one day old, resided in an environment that was injurious to his welfare. See 705 ILCS 405/2-3(1)(b) (West 2004). In support, the State alleged that the respondent had already been declared unfit as to six of her other children, in relation to whom termination proceedings were pending. Later that same day, the trial court held an ex parte emergency shelter care hearing. At the hearing, Walters described the events that led to D.S.'s birth in Crawfordsville. When asked whether she had notified respondent of the emergency shelter care hearing, Walters replied that she had not because she was "not sure exactly what hospital's she's in, and * * * they're concerned she will flee with the baby." At the hearing's conclusion, *1219 the trial court found that it was a matter of immediate and urgent necessity to temporarily remove D.S. from respondent's custody. In support, the trial court cited both the prior neglect findings and the possibility that respondent would flee with D.S. and conceal him from Illinois authorities.
On March 10, 2004, the trial court held a second emergency shelter care hearing, for which respondent was present. The State again called Jacqui Walters, and she repeated most of her previous testimony. Walters then explained that the terminations that were pending as to respondent's six other children were based in part upon respondent's diagnosis with borderline personality disorder, antisocial disorder, and psychotic features. According to Walters, respondent's mental illness posed a risk to the children. Although respondent was supposed to be receiving treatment, she had missed 5 of her last 13 counseling sessions. At the hearing's conclusion, the trial court again found that it was a matter of immediate and urgent necessity to temporarily remove D.S. from respondent's custody. This time, the trial court cited both respondent's "effort to secret the child from the Department of Children and Family Services" and respondent's "serious mental health issues, which directly impact her ability to care for the child and her children." The trial court then granted temporary custody of D.S. to DCFS.
On April 16, 1994, the trial court held an adjudicatory hearing. The State first called Ann Kapella, a child protection investigator with DCFS. Kapella testified as to a March 4, 2003, conversation with respondent, in which respondent stated that she did not go to Covenant Hospital as instructed by Dr. Trupin because she "didn't want to give birth to the baby here in the State of Illinois." According to Kapella, respondent told her that she was afraid that "[DCFS] would take this baby as well." The State then called Jacqui Walters, who again testified as to respondent's diagnosed mental-health issues. Walters explained that, although respondent was receiving treatment for her mental illness, that course of treatment was not yet complete. Finally, respondent herself testified, confirming that she left for Tennessee after the March 2 appointment because she "was scared of the removal of this child." At the hearing's conclusion, the trial court found that D.S. was a neglected child due to an injurious environment. In support, the trial court cited both respondent's "psychiatric condition that remains untreated" and respondent's decision "to hide the birth of this child by leaving the State without making any provision or arrangement for the birth of the child elsewhere." On this latter point, the trial court added:
"To take off in a car when you were obviously so close to giving birth, so close that the hospital in Champaign was trying to find out where you were * * *. That was an extremely dangerous thing you did. That was injurious to the child's welfare."
A dispositional hearing followed, and the trial court entered an order finding that respondent was unfit to care for D.S. and that it was in D.S.'s best interest to be made a ward of the court. Custody was again awarded to DCFS.
Respondent appealed, arguing that (1) the trial court lacked subject matter jurisdiction under the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/201 et seq. (West 2004)) because, at the time the wardship petition was filed, D.S. had never lived in Illinois; (2) the failure to notify respondent of the March 3, 2004, hearing rendered that hearing improper; and (3) the trial *1220 court's adjudication of wardship was against the manifest weight of the evidence. With one justice dissenting, the appellate court rejected all of respondent's arguments and affirmed the trial court's judgment. 354 Ill.App.3d 251, 293 Ill.Dec. 691, 828 N.E.2d 1189. We granted respondent's petition for leave to appeal (177 Ill.2d R. 315(a)).

DISCUSSION
Before this court, respondent repeats the arguments raised below. We address each of these in turn.

Subject Matter Jurisdiction
This issue requires us to construe section 201(a) of the UCCJEA, which defines the circumstances under which "a court of this State has jurisdiction to make an initial child-custody determination." 750 ILCS 36/201(a) (West 2004). The principles governing our inquiry are familiar. The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. Michigan Avenue National Bank v. County of Cook, 191 Ill.2d 493, 503-04, 247 Ill.Dec. 473, 732 N.E.2d 528 (2000). Accordingly, courts should consider the statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it. People v. Davis, 199 Ill.2d 130, 135, 262 Ill.Dec. 721, 766 N.E.2d 641 (2002). The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. Illinois Graphics Co. v. Nickum, 159 Ill.2d 469, 479, 203 Ill.Dec. 463, 639 N.E.2d 1282 (1994). Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. Davis v. Toshiba Machine Co., America, 186 Ill.2d 181, 184-85, 237 Ill.Dec. 769, 710 N.E.2d 399 (1999). The construction of a statute is a question of law that is reviewed de novo. In re Estate of Dierkes, 191 Ill.2d 326, 330, 246 Ill.Dec. 636, 730 N.E.2d 1101 (2000).
Under section 201(a), a court of this state will have jurisdiction to make an initial child custody determination only if:
"(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;
(2) a court of another state does not have jurisdiction under paragraph (1) * * * and:
(A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and
(B) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;
(3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under Section 207 or 208; or
(4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3)." 750 ILCS 36/201(a) (West 2004).
In the case of a child less than six months of age, the UCCJEA defines "home state" as "the state in which the child lived from birth with [a parent or a person acting as a parent]." 750 ILCS 36/102(7) (West 2004).
Respondent argues that, under section 201(a), Indiana is D.S.'s statutory "home state" and therefore the only state with jurisdiction to make a custody determination *1221 as to D.S. In support, respondent contends that D.S. was less than six months old when these proceedings commenced, was born in Indiana, and "lived his entire life with his mother within the State of Indiana prior to being brought to Illinois by DCFS." The State counters that D.S. has no "home state" for purposes of the UCCJEA and that Illinois therefore has jurisdiction under sections 201(a)(2) and 201(a)(4). We agree with the State.
We begin with the "home state" definition, which states that "[i]n the case of a child less than six months of age, [`home state'] means the state in which the child lived from birth with [a parent or a person acting as a parent]." 750 ILCS 36/102(7) (West 2004). Although no Illinois court has yet construed this language, several other courts have issued decisions that we find both relevant and instructive.
In In re R.P., 966 S.W.2d 292 (Mo.App. 1998), the mother, who lived in Missouri and had several termination proceedings pending in Missouri, crossed the border into Kansas to give birth. Kansas authorities contacted Missouri authorities and asked them to pick up the baby from the hospital. The Missouri authorities did so, and a neglect proceeding was commenced. In rejecting the parents' argument that Kansas possessed exclusive "home state" jurisdiction over the baby, the appellate court explained that "`[t]he requirement that the child "live with" the mother from birth requires more than the mother and newborn child staying at the same hospital for a brief period.'" R.P., 966 S.W.2d at 300, quoting In re Adoption of Baby Girl B., 19 Kan.App.2d 283, 290, 867 P.2d 1074, 1079 (1994). Accordingly, the court held that "Kansas is not the `home state' of R.P. simply because R.P. and her mother stayed in a hospital there for two days after R.P.'s birth; R.P. has never `lived with' her parents at all." R.P., 966 S.W.2d at 300. The court promptly added, however, that Missouri was not the baby's "home state" either. On this point, the court explained that, "[a]t the time the first petition was filed, R.P. did not live in Missouri with her parents at all, and her placement by DFS, with a person acting as a parent, did not make Missouri the state in which she has lived since birth, because she was born in Kansas." R.P., 966 S.W.2d at 300.
Another helpful case is Adoption House, Inc. v. A.R., 820 A.2d 402 (Del.Fam.Ct. 2003). In that case, a Delaware adoption agency preplaced two babies with two different families, one living in Pennsylvania and one living in Delaware. Both babies were born in Pennsylvania hospitals, and both left the hospital with the adoptive parents. Two months later, the agency filed petitions in Delaware family court to terminate the parental rights of the babies' birth parents. On its own motion, the court raised the issue of subject matter jurisdiction. After briefing by the parties, the court explained that "[t]he state in which the homes of their placement are located constitutes the state in which each child has `lived' within the meaning of the [uniform definition of `home state']." Adoption House, 820 A.2d at 409. Consequently, the court held that (1) it did not have jurisdiction over the baby placed in Pennsylvania, as that baby had "lived from birth" in Pennsylvania; but (2) it did have jurisdiction over the baby placed in Delaware, as that baby, although born in a Pennsylvania hospital, had "lived from birth" in Delaware. Adoption House, 820 A.2d at 409. Although not directly stated, the implicit underpinning of this ruling is that, by itself, the temporary hospital stay in Pennsylvania was insufficient to confer "home state" jurisdiction on that state. On this point, at least, Adoption House is *1222 entirely consistent with R.P.[1]
The Pennsylvania Superior Court likewise touched upon this issue in Joselit v. Joselit, 375 Pa.Super. 203, 544 A.2d 59 (1988). In that case, a Pennsylvania couple gave birth to a son in Pennsylvania hospital. At eight months old, the baby developed complications and was admitted to a New York hospital, where he was kept for several months. In the meantime, the couple separated, and the father filed a custody petition in Pennsylvania. The wife moved to dismiss, arguing that New York was the more convenient forum. The trial court agreed and granted the motion. In reversing, the appellate court stated:
"Initially, the trial court concluded that the child resided in New York during hospitalization and recuperation and that New York, therefore, had become the home state of the child during that period. We are constrained to disagree. The hospitalization in New York was temporary and did not effect a change in the child's domicile or home state. During this entire period, the child was subject to the control of one or both parents who resided in Scranton, Pennsylvania. The child's home state did not change merely because of temporary hospitalization in another state." (Emphases added.) Joselit, 375 Pa.Super. at 210, 544 A.2d at 62.
In other words, like the courts in both R.P. and Adoption House, the court in Joselit refused to use a temporary hospital stay as a basis for conferring "home state" jurisdiction.
We find these cases entirely persuasive. By itself, a temporary hospital stay incident to delivery is simply insufficient to confer "home state" jurisdiction under the UCCJEA. Again, the best indication of legislative intent is the statutory language, given its plain and ordinary meaning. Illinois Graphics Co., 159 Ill.2d at 479, 203 Ill.Dec. 463, 639 N.E.2d 1282. Section 102(7) defines a newborn's home state as the state in which he or she has "lived from birth" with his or her parents. The crucial question, of course, is what did the drafters of the UCCJEA mean by "live," a verb that can mean many different things depending upon the context. Did they mean, as respondents seem to suggest, nothing more than "to be alive"? See Webster's Third New International Dictionary 1323 (1993). That, for purposes of the UCCJEA, a child "lives" in every jurisdiction in which he or she draws a breath? Or did they mean, as the case law teaches, something more like "to occupy a home"? See Webster's Third New International Dictionary 1323 (1993). We are convinced that they meant the latter. When people speak of where a mother and newborn baby "live," they do not speak of the maternity ward. Instead, they speak of the place to which the mother and baby return following discharge from the hospital. In many parts of Illinois, the mother's hospital of choice may be located in another city or even another state. Hoopeston mothers, we now know, may deliver in Champaign. Galena mothers may deliver in Dubuque. Yet no one would respond "a hospital in Champaign" or "a hospital in Dubuque" if asked where these mothers and babies live. Rather, they would respond "Hoopeston" or "Galena" because that is where these mothers and babies *1223 "live," as that term is commonly understood.
As importantly, allowing a temporary hospital stay to confer "home state" jurisdiction would undermine the public policy goals of the UCCJEA, which include ensuring that "a custody decree is rendered in that State which can best decide the case in the interest of the child." (Emphasis added.) 9 U.L.A. § 101, Comment, at 657 (1999).[2] Consider, again, a Galena mother who chooses to deliver her baby in a Dubuque hospital. In addition to living in Illinois, this mother may work in Illinois, have a husband and other children in Illinois, pay taxes in Illinois, attend church in Illinois, and send her children to Illinois schools. Clearly, if the occasion arose, Illinois would be the state "which can best decide" a case involving the interest of this mother's children. Yet, if respondent is correct, and a mere hospital stay is sufficient to confer home state jurisdiction under the UCCJEA, Iowa would possess exclusive jurisdiction over this newborn, based solely on the location of the obstetrician's practice. Such formalism turns the UCCJEA on its head, conferring jurisdiction on a state with a de minimis interest in the child, to the exclusion of the only state that could conceivably be called the child's "home." We refuse to endorse this interpretation.[3]
For these reasons, we reject respondent's argument that Indiana is D.S.'s "home state" for purposes of the UCCJEA. Respondent's own testimony established that she had no connection to Indiana and no intention of remaining there following D.S.'s birth. On the contrary, respondent testified that she is a longtime resident of Illinois who, fearful of losing custody of D.S., intended to move to Tennessee. En route, she entered active labor and checked herself into the nearest hospital, which happened to be in Crawfordsville, Indiana. By itself, this temporary hospital stay in Indiana is simply insufficient to confer "home state" jurisdiction upon that state. As importantly, neither party makes any attempt to argue that any other state possessed "home state" jurisdiction over D.S. when the wardship petition was filed. We therefore agree with the State's assessment that D.S. lacks a "home state" for UCCJEA purposes.
That takes us to section 201(a)(2), which clearly provides a basis for the trial court's exercise of jurisdiction in this case. Under this section, Illinois has jurisdiction if (1) no other state has "home state" jurisdiction; (2) D.S. and at least one of his parents has a significant connection with Illinois, other than mere physical presence; and (3) substantial evidence is available in Illinois concerning D.S.'s care, protection, training, and personal relationships. 750 ILCS 36/201(a) (West 2004). On the first point, we have already established that no other state has "home state" jurisdiction under section 201(a)(1). On the second point, the record shows that D.S.'s father and six of his half-siblings are Illinois residents, and that respondent was a longtime Illinois resident at least until the morning of D.S.'s birth. On the third point, there is no question that substantial evidence is available in Illinois concerning D.S.'s care, *1224 protection, training, and personal relationships. Again, both of D.S.'s parents and six of his eight half-siblings are longtime residents of Illinois. D.S.'s half-siblings are the subject of termination proceedings pending in the very same judicial circuit that entered the decision below, and those proceedings have generated a substantial record relating to respondent's parental fitness and mental health. Respondent's mental health records are located in Illinois, and Illinois is where respondent received her prenatal care while pregnant with D.S. Indeed, the record strongly suggests that, with the possible exception of the records relating to D.S.'s actual delivery in Crawfordsville, all of the evidence concerning D.S.'s care, protection, training, and personal relationships will be found in Illinois. Accordingly, we hold that the trial court possessed jurisdiction under section 201(a)(2).
Because of our holding, we need not address the State's argument that the trial court also possessed jurisdiction under section 201(a)(4).

Lack of Notice
Respondent next argues that the trial court erred in proceeding with the March 3, 2004, ex parte hearing in the absence of notice to respondent. According to respondent, "DCFS did not demonstrate that it was unable to serve [respondent] with notice; rather, the evidence indicates that DCFS simply did not bother with ascertaining [respondent's] location when it easily could have done so." Consequently, "the trial court erred in continuing with the hearing and entering an order relating to [D.S.]"
Like the appellate court, we conclude that this issue is moot. An issue is rendered moot when an intervening event makes it impossible for the reviewing court to grant effective relief to the complaining party. In re A Minor, 127 Ill.2d 247, 255, 130 Ill.Dec. 225, 537 N.E.2d 292 (1989). Here, the intervening event was the March 10, 2004, shelter care hearing, which respondent attended after receiving proper notice and summons. This was a second, complete shelter care hearing, which was wholly independent of and in no way contingent upon the March 3, 2004, ex parte hearing. As importantly, the Juvenile Court Act expressly provides for the procedure that occurred in this case. Section 2-10(3) of the Juvenile Court Act provides that:
"If * * * the moving party is unable to serve notice on the party respondent, the shelter care hearing may proceed ex-parte. A shelter care order from an ex-parte hearing shall be endorsed with the date and hour of issuance and shall be filed with the clerk's office and entered of record. The order shall expire after 10 days from the time it is issued unless before its expiration it is renewed, at a hearing upon appearance of the party respondent, or upon an affidavit of the moving party as to all diligent efforts to notify the party respondent by notice as herein prescribed." 705 ILCS 405/2-10(3) (West 2004).
Here, Jacqui Walters testified at the March 3, 2004, hearing that she was unable to notify respondent of that day's hearing because she did not know what hospital respondent was in. Whether or not this was true, the fact remains that the trial court did not allow its March 3, 2004, order to stand unchallenged. Instead, the trial court ordered the State to reappear within 10 days for another shelter care hearing, at which the State would once again have to prove its case from scratch. Respondent received notice and summons of this second hearing, and she appeared and participated fully. Thus, even if we agreed that the trial court should not have proceeded ex parte on March 3, the fact *1225 that a duplicate hearing was held on March 10 renders any earlier errors inconsequential.

Sufficiency of the Evidence
Respondent makes two arguments relating to the sufficiency of the evidence, neither of which is convincing. First, respondent argues that the trial court lacked jurisdiction over this cause because the evidence presented at the March 3, 2004, hearing was insufficient to support a finding that D.S. was abused or neglected. In support, respondent cites In re M.B., 235 Ill.App.3d 352, 176 Ill.Dec. 454, 601 N.E.2d 1152 (1992). According to respondent, M.B. stands for the proposition that "Illinois court's [sic] are without jurisdiction in a wardship proceeding absent proof that a child is `abused, neglected or dependent.'" (Emphasis added.) Respondent then asserts that, because "no evidence" was presented at the March 3, 2004, hearing to support a finding of abuse or neglect, the trial court "was without jurisdiction to enter the March 3, 2004, order."
Respondent misreads M.B. In In re Arthur H., 212 Ill.2d 441, 289 Ill.Dec. 238, 819 N.E.2d 734 (2004), this court recently discussed M.B. and endorsed its conclusion that "a finding of abuse, neglect or dependence is jurisdictional, `"without [which] the trial court lacks jurisdiction to proceed to an adjudication of wardship."'" (Emphasis added.) In re Arthur H., 212 Ill.2d at 464, 289 Ill.Dec. 238, 819 N.E.2d 734, quoting In re M.B., 235 Ill.App.3d 352, 377, 176 Ill.Dec. 454, 601 N.E.2d 1152 (1992), quoting In re Shawn B., 218 Ill. App.3d 374, 380, 161 Ill.Dec. 142, 578 N.E.2d 269 (1991). In other words, M.B. simply confirms that, unless and until it makes a neglect finding, the trial court is without jurisdiction to adjudicate wardship. M.B. in no way supports the notion that a trial court's jurisdiction is contingent upon, or in any way a function of, the quality of the State's proof. Indeed, such a rule would flatly contradict the well-established principle that a circuit court does not lose jurisdiction simply by making an erroneous finding of fact. See In re Marriage of Mitchell, 181 Ill.2d 169, 174-75, 229 Ill.Dec. 508, 692 N.E.2d 281 (1998); M.B., 235 Ill.App.3d at 377, 176 Ill.Dec. 454, 601 N.E.2d 1152.
Respondent's second argument is that the evidence was insufficient to support the trial court's finding that D.S. was an abused and neglected minor. We disagree. On review, a trial court's ruling of neglect will not be reversed unless it is against the manifest weight of the evidence. In re Arthur H., 212 Ill.2d at 464, 289 Ill.Dec. 238, 819 N.E.2d 734. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. In re Arthur H., 212 Ill.2d at 464, 289 Ill.Dec. 238, 819 N.E.2d 734. Here, the trial court found that D.S. was a neglected minor due to an "injurious environment." The phrase "injurious environment" includes "the breach of a parent's duty to ensure a `safe and nurturing shelter' for his or her children." In re N.B., 191 Ill.2d 338, 346, 246 Ill.Dec. 621, 730 N.E.2d 1086 (2000), quoting In re M.K., 271 Ill.App.3d 820, 826, 208 Ill.Dec. 242, 649 N.E.2d 74 (1995). In support of its finding that D.S.'s environment was injurious to his welfare, the trial court cited three things, all of which are fully supported by the record: (1) respondent's six pending terminations; (2) respondent's decision to flee Illinois without making any provision for D.S.'s delivery, rather than checking immediately into the hospital as instructed by her obstetrician;[4] and (3) *1226 respondent's failure to complete the necessary treatment for her serious mental-health issues. Like the appellate court, we agree that these facts, considered together, more than support the trial court's neglect finding.

CONCLUSION
For the foregoing reason, the judgment of the appellate court is affirmed.
Affirmed.
Justice GARMAN took no part in the consideration or decision of this case.
NOTES
[1] Of course, the R.P. court would reject Adoption House's conclusion that the baby placed in Delaware had "lived from birth" in Delaware, as the baby was born in Pennsylvania. See R.P., 966 S.W.2d at 300 ("Missouri [is not] the state in which she has lived since birth, because she was born in Kansas"). We need not concern ourselves with this conflict, however, as this particular point is not presently before us.
[2] Although uniform acts no longer contain statements of purpose, the committee comments to section 101 of the UCCJEA expressly identify the UCCJEA's essential purposes and direct that the UCCJEA "should be interpreted according to" those purposes. See 9 U.L.A. § 101, Comment, at 657 (1999).
[3] The same concerns would apply to Illinois mothers who go into labor and deliver their babies while vacationing, working, or otherwise temporarily traveling out of state.
[4] Respondent insists that this finding is "mere supposition," as there is no direct evidence that respondent's decision to leave for Tennessee on March 2 was motivated by anything other than a good-faith desire to relocate. Respondent apparently overlooks her own testimony that she left for Tennessee after the March 2 appointment because she "was scared of the removal of this child."