2025 IL App (1st) 240859-U

SECOND DIVISION
September 2, 2025

No. 1-24-0859

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

# IN THE APPELLATE COURT OF ILLINOIS
## FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN RE: MATTER OF THE APPLICATION OF COUNTY TREASURER | ) ) ) | Appeal from the Circuit Court |
| (CORTEZZ, LLC, | ) ) | of Cook County |
| Petitioner-Appellee, | ) ) | 21COTD255 |
| v. | ) ) | Honorable Araceli De La Cruz, |
| JAYLNN & JAVARIS FOUNDATION, INC., | ) ) | Judge Presiding |
| Respondent-Appellant). | ) | |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

## O R D E R

¶ 1     *Held*: Denial of petition to vacate tax deed affirmed where former property owner did not present clear and convincing evidence that tax deed buyer's affidavit and lawyer's statements amounted to fraud upon the court about efforts to give notice.

¶ 2     The circuit court granted a tax deed to Cortezz, LLC ("Cortezz") for commercial/residential mixed use property belonging to Jaylnn & Javaris Foundation, Inc. ("J & J"). Five months later, J & J filed a section 2-1401 petition to vacate the order, contending it had been unaware of the proceedings and that the tax deed was procured by fraud at the prove up hearing when Cortezz "basically exaggerated" its attempts to give J & J notice. 735 ILCS 5/2-1401 (West 2020). Section

22-45(3) of the Property Tax Code provides for relief from a tax deed under either section 2-1203 or 2-1401 of the Code of Civil Procedure when there is "proof by clear and convincing evidence that the tax deed has been procured by fraud or deception by the tax purchaser." 35 ILCS 200/22-45(3) (West 2020); 735 ILCS 5/2-1203, 2-1401 (West 2020). After an evidentiary hearing, the circuit court denied J & J's petition, and J & J has appealed the ruling.

¶ 3    J & J is a non-profit, 501(c)(3) organization that secures affordable housing for low-income individuals and families. Javaris L. Gardner is J & J's president. In 2016, J & J was given a two-story building that was identified by two sequential street numbers. The portion of the building that became subject to delinquent tax deed proceedings is commonly known as 354 E. 115th Street, Chicago, IL 60628 ("354") and is referenced by permanent index number or "PIN" 25-22-123-006-0000. The adjoining property is 352 E. 115th Street ("352") and is cataloged under PIN 25-22-123-005-0000. The donee, Gregory Edinburg, executed a quit claim deed that had been prepared by Gardner's attorney, Harry A. Schroeder. The quit claim deed directed J & J's tax bills to Schroeder's office at 1619 Western Avenue, Chicago Heights, IL 60411. No one, however, paid 354's 2017 general taxes totaling $1,743, and Schroeder died shortly thereafter, in 2018.

¶ 4    Appellee Cortezz and at least five other corporations managed by Greg R. Bingham are in the business of buying delinquent real estate taxes in Illinois, Colorado, Florida, and New Jersey, and managing or remodeling property. Bingham, through his corporation, Intaxx, LLC, purchased 354's delinquent taxes at auction on May 7, 2019.

¶ 5    An *ex parte* prove up hearing was held via videoconference on October 28, 2021, during which, in lieu of having Bingham testify, attorney Douglas S. Miller submitted Bingham's affidavit and summarized its contents for the court. According to Miller, Bingham swore (1) he

was over the age of 21 and competent, (2) he went to 354 in March 2021 during the notice-serving period and observed that it was a commercial, mixed-use property, and (3) "he was unable to obtain if anybody was living there at the time or able to contact anybody." The circuit court asked Miller, "So is [it Bingham's] opinion as to the time of this affidavit, [that] the property is unimproved, vacant, and abandoned and/or occupied, or to be determined later?." Miller responded that Bingham "believes it's vacant but he's not 100 percent," "[s]o he didn't want to testify that it was vacant," and "I guess it [the occupancy status] will have to be determined later." The court said, "Okay. Well, when you submit all your documents, maybe give me an updated affidavit from this gentleman." Miller answered, "Okay. I'll see what he can find out." There is an affidavit in the record that was sworn to by Bingham and notarized by Miller on January 31, 2022. The contents of the January affidavit are basically consistent with Miller's summary during the October hearing.

¶ 6      As the prove up continued, Miller said that the required notices had been served, including a take notice pursuant to section 22-5 of the Property Tax Code (735 ILCS 200/22-5 (West 2020)) that was delivered to the Cook County Clerk's office with directions to mail it to J & J as the last assessed party.

¶ 7      Miller also said that a title company searched public records and "we served all interested parties." The record discloses that Intaxx had difficulty making personal contact with anyone and resorted mostly to certified mail. Miller specified that Intaxx attempted and did not succeed with personal service on J & J "at their corporate offices" on March 19 and 23, 2021. Miller was referring to J & J's registered agent at the time, which was New Link Access Corporation, 1229 N. North Branch St., Suite 101, Chicago, IL 60642. Intaxx could not personally serve lienholder The Closers Firm, Inc. ("The Closers") on the first floor of the subject property, on an unspecified

date. In 2019, The Closers had liens against the property totaling $86,000. Miller also told the court that Intaxx could not make contact with any unknown occupants of the property on March 25, 2021. Miller also said there was a mortgage that was "probably released," but "to be safe," Intaxx had attempted to personally serve the lender and two people associated with the loan, which were Byline Bank at 180 North LaSalle, as successor in interest to Allegiance Community Bank; Edinburg (the person who donated the property to J & J), at two different addresses in Tinley Park, Illinois; and Newlyn N. Stephenson, Sr., at two addresses in Country Club Hills, Illinois and one location in Crown Point, Indiana.

¶ 8    At the conclusion of the prove up, the judge said that when he received all the documents, he would take the matter under advisement, and if there was strict compliance with the Property Tax Code (35 ILCS 200/1 *et seq.* (West 2020)), then the court would direct the county clerk to issue a tax deed. On February 3, 2022, the judge entered judgment for Intaxx. On March 11, 2022, the judge granted Intaxx's motion to substitute Cortezz as the petitioner and directed issuance of a tax deed. The record discloses that one day earlier, on March 10, 2022, the corporation database maintained by the Illinois Secretary of State was updated to indicate that Gardner was J & J's agent, and that his address was at 352, Apartment 1. The judge granted possession of 354 to Cortezz on April 19, 2022, but stayed execution of the order until May 19, 2022. According to J & J's amended verified section 2-1041 petition to vacate the tax deed, Gardner was in the courtroom when the possession order was entered and, despite the court's suggestion that Bingham and Gardner discuss a resolution, when Bingham came to the property for a "walk through," he would not negotiate. An eviction occurred in June 2022. The Honorable Alfred J. Paul subsequently retired and a different circuit court judge was assigned to the matter.

¶ 9 J & J presented numerous arguments in its amended verified section 2-1401 petition. In an attached affidavit, Gardner swore that he never received a take notice or redemption rights notice nor had any other J & J representative. J & J contended that it would have been possible to personally serve Gardner because Bingham had apparently scouted the property for about a year, and during one of Bingham's visits, Gardner had identified himself as the owner. In his affidavit, Gardner swore that he was "there daily" and Melvin Woolfolk, who was the president of The Closers, "was also there on an almost daily basis *** performing rehabilitation services," which Gardner contended meant that attorney Miller had "false[ly]" represented to the court that Bingham could neither determine if anybody was living there nor make contact. J & J also contended that Miller's statements at the prove up about the contents of Bingham's affidavit were "textbook hearsay" about whether the property was vacant. Gardner swore that the take notice dated September 13, 2019 had been sent to his attorney at 1619 Western Avenue, but counsel had died a year earlier and the office was "abandoned." J & J pointed out that when certified mail was sent in March 2021, the postal service temporarily was not requiring recipient signatures and that a mail carrier had scrawled "COVID 19" in the signature block. Gardner denied that the property was mortgaged and specified that the mortgage that Edinburg had during his ownership had been released. J & J also attached Bingham's January affidavit and argued that it did not comply with section 1-109 of the Code of Civil Procedure, 735 ILCS 5/1-109 (West 2020), in three ways, given that it did not (1) specify that Bingham was "an interested witness," (2) indicate in paragraph 5 that the occupancy status was stated "upon information and belief," or (3) specify that Bingham was subjecting himself to the penalties of perjury.

¶ 10 The circuit court received Cortezz's written response to the amended 2-1401 petition, both

sides submitted pre- and post-hearing memos, and there was an evidentiary hearing on February 22, 2024 during which Gardner and Bingham testified. The circuit court also had benefit of a hearing transcript before it ruled.

¶ 11   Bingham testified that he earned an economics degree in 1991, had been in the business of buying delinquent real estate taxes for over 25 years and also remodeled and managed property. He employed himself as a manager and three other people in bookkeeping and administrative roles at Start Rehab Real Estate in Northlake, Illinois. He did not employ in-house counsel, but for two to three years, Miller had been sharing the office space. After purchasing 354's delinquent taxes, Bingham used the treasurer's last billing address to give notice and also investigated addresses that were publicly available through Chicago Title and cyberdriveillinois.com, which is the Secretary of State's website. Bingham did "[n]othing beyond what [was] required by the statutes." Later, when Gardner told Bingham that 354 was tax exempt, Bingham gave "our standard response" which was that Gardner needed to "straighten this out downtown" and Bingham did not investigate into the exemption status given that "everything was done according to the guidelines of the statute." Bingham had driven past 354 many times because of where it was located and he visited the location "probably twice." He saw plywood across the front of the ground floor, although the "second floor had windows," and that the building had no mailbox, "identifiers," "controlling signs," or "management signs" out front, which were indications that 354 was "basically derelict and/or vacant." He did not know that 354 and 352 were "connected" and denied knocking at 352 when he was evaluating 354 for potential purchase. When shown the single quit claim deed which conveyed 352 and 354 to J & J, Bingham denied seeing it before and said that he relied on the title company to determine who had title. He did not personally know whether any attempts were made

to contact J & J as the titleholder, given that Bingham's company "handled thousands of files." In February 2022, two months before getting the deed, Bingham got out of his car and met a middle-aged African American man in front in 354, but Bingham did not get the man's name and was incapable of recognizing him later. At least twice, Gardner called Bingham's office saying that he "wanted to buy the property back," which Bingham was willing to agree to, but Gardner wanted "special terms" instead of paying cash. When they met in person, Gardner "still offered no cash." When asked why Intaxx and Start Rehab Real Estate were "separate and apart" when they "did similar work," Bingham explained that he used bank lines of credit, banks wanted to own tax liens but not real estate, and Intaxx was changed to Cortezz in these proceedings because Intaxx owns tax liens and Cortezz owns real estate.

¶ 12 Bingham was shown J & J's certificate of good standing as an Illinois corporation, which had been accessed on February 12, 2021, through cyberdriveillinois.com. The website indicated that the address of J & J's registered agent was New Link Access Corporation, at 1229 North Branch Street, Suite 101, Chicago, IL 60642 and Bingham testified that on March 19 and 23, 2021, J & J was served at this address by certified mail. Similarly, the "county records" for J & J indicated that its address was 1619 Western Avenue (attorney Schroeder's office), which was where the section 22-5 take notice had been sent by certified mail.

¶ 13 Gardner was the other hearing witness. Gardner testified that 352 and 354 were spanned by "one solid [stone] building with four *** entrances" at the front. Around back, there was a single fence enclosing the building's two porches and garage. There was a mail slot in 352's front door where "[t]hey could just slide the mail right in the door." In 2021, he was residing at 352 and frequently receiving mail there, but he did not receive mail notifying him that 354 had been sold

for delinquent taxes. There was a black mailbox affixed to the front of 354. In 2021, The Closing Firm[1] had almost finished renovating 354's ground floor with ten suites for small business owners and The Closing Firm would have next renovated the upstairs residence for low-to-moderate income families. The project started in 2018 and the rehabbers worked "all week," even on the weekends. Gardner would be at 354 twice a week, depending upon what was being done, and not more frequently because it was undergoing a "massive clean out" at the time. J & J never mortgaged 354 and the only lienholder was the rehabbing company. Gardner and Woolfolk, the president of The Closing Firm, had no difficulty contacting each other and would speak by phone daily. No one told Gardner that 354's taxes were sold. He first learned of proceedings in April 2022, when a thick legal document was dropped into 354's mailbox, with no envelope. As soon as he saw it, he called an attorney who filed an appearance. Gardner later learned that the deed was assigned to Cortezz. In June 2022, a "walk through" was scheduled for the tax buyer, which was when Gardner met and recognized Bingham as someone who scouted the property in 2021. One of those times, Bingham was taking photos from his work truck, so Gardner approached him, asking whether everything was okay, and Bingham replied that everything was okay and drove off. During the "walk through," Gardner tried to negotiate, but Bingham said that J & J did not have any money and it was too late for Gardner to do anything, so the conversation "got a little heated" and Bingham walked off. Gardner still thought that they could work something out if he used an attorney to negotiate with Bingham's attorney, but about two weeks after that, the sheriff showed up. At the time, no one was in the ground floor commercial unit and the second story

---

[1] It is unclear from the record whether the rehab company's correct name is "The Closers Firm" or the "The Closing Firm."

residential tenant was in the apartment. The sheriff broke open the doors, told the tenant she could call later and retrieve her things, and Cortezz installed its own locks. Gardner did not receive certified mail advising him of the proceedings. He also never received a tax bill for 354, which he thought was because the property was not in use or was exempted due to its ownership by a nonprofit organization. He did receive a tax bill for 352, but the first one was in 2018, and it was only for $568, which he thought was because he was staying in the upstairs residential unit. Gardner worked next door to attorney Schroeder's former office in Chicago Heights and described it as "pretty condemned" and "abandoned" after the lawyer's death in 2018 because all its windows were broken out and the "brush was very high."

¶ 14 Gardner also said that he updated the mailing address for the tax bill, but he could not recall when. He acknowledged receiving about 12 pages in April 2022, which included a tax deed and motion for order of possession, and that he and his attorney went to the hearing. Gardner thought that the judge gave a continuance instead of possession and told the parties to use the time to negotiate. He acknowledged that the mailing address on the documents was 354's. There were sheriff's affidavits indicating service was attempted at New Link Access, at 1229 N. North Branch Street, but Gardner denied that the organization was J & J's registered agent at the time. He said there was an e-mail in 2019 between New Link Access and J & J indicating that they were no longer doing business, although he did not have "anything [to that effect] from the Secretary of State." He acknowledged that service was attempted at 354 in March 2021 upon The Closing Firm and unknown occupants. The circuit court then noted that the affidavits indicated the documents were not served.

¶ 15 Gardner also testified that J & J's website in 2019, 2020, and 2021 included e-mail and

mailing addresses as well as a phone number, but J & J did not receive any e-mail or phone calls concerning the tax matters.

¶ 16    J & J then argued that the hearing established that Bingham was a sophisticated tax purchaser and that his company did the minimum to comply with the take notice requirements during the pandemic. Gardner's contact information was "readily accessible" on the Internet, Gardner lived at 352, and Woolfolk was working daily at 354, so they could have "easily been contacted or notified of these proceedings," but that did not happen because "they didn't want it to be done." If notice had been provided, there would have been no need for a prove up or the situation could have been "readily resolved" by Gardner's testimony at the prove up. If Bingham had been willing to subsequently negotiate, the parties could have resolved the matter. When none of this happened, a 2-1401 petition became necessary, and it should be granted.

¶ 17    Cortezz countered that it had complied with the property tax statute by sending notices including to notice to the registered agent at the time; "Judge Paul was a very knowledgeable judge" and saw nothing fraudulent; and despite Gardner's testimony that he did not receive notice, the law did not require receipt. Cortezz contended that J & J had introduced a lot of information that was irrelevant to the issue of procuring the tax deed. Also, J & J indicated it was a 501(c)(3) corporation but did not allege or provide evidence that the property was exempt from taxation, and, in the unlikely event that the court vacated the tax deed on this basis, then it should also order the county to refund Cortezz. *See* 30 ILCS 200/20-34(2) (West 2020).

¶ 18    After reviewing all of the parties' materials, the circuit court concluded that the information presented did not amount to clear and convincing evidence that there was " 'wrongful intent—an act calculated to deceive' [at the prove up]" in order to obtain the tax deed.

" '[T]he primary purpose of the tax sales provisions of the Property Tax Code is to coerce tax delinquent property owners to pay their taxes, not to assist tax petitioners in depriving the true owners of their property.' [Citation.] The notice provisions assure that all persons with sufficient interest in the property receive appropriate notice of the tax deficiency, sale, and time for redemption. [Citation.] Sections 22-10 and 22-15 establish[] that owners, trustees, lienholders, and occupants have such interests in the property. 35 ILCS 200/22-10, 22-15 (West 2000)." *In re Application of the County Treasurer*, 347 Ill. App. 3d 769, 777 (2004).

¶ 19 After the redemption period has expired without a redemption by the property owner, a tax purchaser may seek a tax deed. The tax deed petitioner must exercise due diligence to locate and notify parties interested in the property and must prove its strict compliance with statutory notice requirements. *In re County Treasurer and ex Officio County Collector of Cook County*, 2022 IL App (1st) 211511, ¶ 38 (*Capital Equity Land Trust*); *In re Application of the County Treasurer and ex Officio County Collector of Cook County*, 2011 IL App (1st) 101966, ¶ 44 (*Glohry*) ("The Code requires a tax purchaser to serve notice upon all individuals holding an interest in the property if their identities can be discovered through diligent inquiry."); 35 ILCS 200/22-15 (West 2020). The tax deed petitioner has the burden of persuading a court that it complied with the law and provided the appropriate notice. *Capital Equity Land Trust*, 2022 IL App (1st) 211511, ¶ 38; *Glohry*, 2011 IL App (1st) 101966, ¶ 44. A tax deed purchaser "has failed to act with minimal diligence if he has not made reasonable efforts to notify all persons whose interest may reasonably be inferred from the public records regarding the property's ownership." *Capital Equity Land Trust*, 2022 IL App (1st) 211511, ¶ 39.

¶ 20 " '[D]ue process does not require that a property owner receive actual notice before the government may take his property.' " *In re County Treasurer and ex Officio County Collector of Cook County*, 2023 IL App (1st) 220182, ¶ 24 (quoting *Jones v. Flowers*, 547 U.S. 220, 226 (2006)). However, constructive notice by publication is considered a last resort—it is to be utilized only when upon diligent inquiry and effort, owners and interested parties cannot be found and personally served. *In re Application of County Collector for Judgment and Order of Sale Against the Lands and Lots Returned Delinquent for Nonpayment of General Taxes for the Year 1987 and Prior Years*, 278 Ill. App. 3d 168, 172 (1996) (*D.S. Associates*).

¶ 21 A diligent inquiry is the kind of search or investigation that a diligent person who is intent upon ascertaining a fact would usually and ordinary make. *Id*. " '[W]hat steps are reasonable in response to new information depends upon what the new information reveals.' " *In re Application of County Collector for Judgment, Sale Against Lands, Lots Returned Delinquent for Nonpayment of General Taxes and/or Special Assessments*, 225 Ill. 2d 208, 231 (2007) (quoting *Jones*, 547 U.S. at 234).

> " 'Typically, diligent inquiry to obtain the names and addresses of interested parties consists of the following acts, although not all are always required and others occasionally may be necessary: (1) ordering an opinion of title from a title company; (2) searching relevant documents in the recorder's office for names and addresses of parties or their attorneys or agents ***; (3) searching relevant court cases such as probate or housing court cases; (4) consulting telephone directories; (5) searching relevant directories and websites on the Internet; (6) inspecting the premises; and (7) interviewing occupants and neighbors. In each case, the scope of the diligent inquiry will be determined by the facts.' " *In re*

*County Treasurer*, 2019 IL App (2d) 180909-U, ¶ 19 (quoting Jeffrey S. Blumenthal, *A Guide to Tax Deed and Indemnity Fund Proceedings*, Real Estate Taxation, § 11.6(n) (Ill. Inst. for Cont. Legal Educ. 2012)).

¶ 22 Tax deeds issued under section 22-40 of the Property Tax Code are virtually incontestable except by appeal from the order directing the county clerk to issue the tax deed, or by petition for relief from the order under sections 2-1203 or 2-1401 of the Code of Civil Procedure. 35 ILCS 200/20-45 (West 2020); 735 ILCS 5/2-1203, 2-1401 (West 2020); *S. I. Securities v. Powless*, 403 Ill. App. 3d 426, 429 (2010) (the legislature intended tax deeds to be virtually incontestable). "The legislature's intent was to provide a tax buyer with a new and independent title, free and clear from all previous titles and claims of every kind, and assurance to the tax buyer that his title and rights to the property would be unimpaired." *Id*. at 429. Tax purchasers participate in the tax sale system in order to obtain marketable titles. See *Village of Dolton v. First National Bank of Blue Island*, 12 Ill. 2d 435, 440 (1957) ("Our whole system of judicial sales is based upon the public's willingness to accept titles thereby created and, for that reason, it has long been the court's policy to protect the purchaser whenever possible."). If tax purchasers do not participate in tax sales, then delinquent taxpayers lose the incentive to pay their real estate taxes and tax revenues fall. See *Cherin v. The R. & C. Co.,* 11 Ill. 2d 447, 451-53 (discussing revisions to the tax foreclosure process and concluding, "It was the purpose of the legislature to provide a method for obtaining merchantable tax titles.").

¶ 23 "[R]elief from such order may be had under Sections 2-1203 or 2-1401 of the Code of Civil Procedure in the same manner and to the same extent as may be had under those sections with respect to final orders and judgments in other proceedings." 35 ILCS 200/20-45 (West 2020). The

grounds for relief under section 2-1401 are limited to just four circumstances: (1) "proof that the taxes were paid prior to sale," (2) "proof that the property was exempt from taxation," (3) "proof by clear and convincing evidence that the tax deed had been procured by fraud or deception by the tax purchaser or his or her assignee," or (4) "proof by a person or party holding a recorded ownership or other recorded interest in the property that he or she was not named as a party in the publication notice as set forth in Section 22-20, and that the tax purchaser or his or her assignee did not make a diligent inquiry and effort to serve that person or party with the notices required by Sections 22-10 through 22-30." *Id.*

¶ 24    A section 2-1401 petitioner alleging that a tax deed was obtained by fraud bears the burden of proof. *Smith v. D. R. G., Inc.*, 63 Ill. 2d 31, 36-37 (1976). Fraud in this context means a wrongful intent, an act calculated to deceive. *Application of County Treasurer and ex Officio Collector of Cook County*, 67 Ill. App. 3d 122 (1978) (*Murray*). Fraud in tax deed proceedings has also been defined as " '[t]the failure to inform the court of any facts that might change the court's ruling.' " *In re County Treasurer and ex Officio County Collector of Cook County*, 2013 IL App (1st) 220070, ¶ 50. A section 2-1401 petition is not intended to relieve a party from the consequences of his or her own mistake or negligence. *Lofendo v. Ozog*, 118 Ill. App. 3d 237, 241 (1983).

¶ 25    On appeal, J & J contends the standard of review is *de novo* because J & J "did not object to the evidence entered and [was] able to enter evidence during the evidentiary hearing" and because J & J is disputing the admission of Bingham's affidavit into evidence. Cortezz contends the standard is abuse of discretion.

¶ 26    Whether to grant a section 2-1401 petition is within the sound discretion of the circuit court, which we find to be the governing standard of review, and we will not disturb the decision unless

there has been an abuse of discretion. *In re M.B.*, 235 Ill. App. 3d 352, 379 (1992) (citing *Smith v. Airoom,* 114 Ill. 2d 209, 221 (1986)); *In re Marriage of Oldham*, 222 Ill. App. 3d 744, 754 (1991)). An abuse of discretion has occurred only when the circuit court ruling was arbitrary, fanciful, or unreasonable or where no reasonable person would take the same view. *In re County Treasurer and Ex Officio County Collector of Cook County*, 2023 IL App (1st) 220070, ¶ 45. In a section 2-1401 proceeding, evaluation of the witnesses' credibility is made by the trier of fact and its judgment will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. 735 ILCS 5/2-1401 (West 2020); *In re M.B.*, 235 Ill. App. 3d at 379 (citing *Uptown Federal Savings & Loan Association of Chicago v. Kotsiopoulos*, 105 Ill. App. 3d 444, 451 (1982); *Collins v. Prestige Casualty Co. of Skokie*, 54 Ill. App. 3d 762, 766 (1977)). The quantum of proof necessary to sustain a 2-1401 petition is a preponderance of the evidence. *In re M.B.*, 235 Ill. App. 3d at 379 (citing *Smith*, 114 Ill. 2d at 221).

¶ 27    On appeal, J & J returns to some of its 2-1401 arguments and adds others. J & J newly contends it was error for Judge Paul to consider Bingham's affidavit because it was misdated and because the notary, attorney Miller, shared office with Bingham, which meant that the notary had "financial and beneficial interest[s]" in the subject matter of the sworn statement. J & J also argues for the first time on appeal that Miller made statements during the prove up that violated the portion of the Illinois Notary Public Act that provides: "No notary public shall be authorized to explain, certify, or verify the contents of any document; however, this prohibition shall not prohibit an attorney, who is also a notary public, from performing notarial acts for any document prepared by that attorney." 5 ILCS 312/6-104(k) (West 2020).

¶ 28    Since none of these arguments were presented in the amended section 2-1401 petition,

J & J forfeited the opportunity to present any of them here. It is well settled that a party that does not raise an issue in the circuit court forfeits that issue and may not raise it for the first time on appeal. *Vantage Hospitality Group, Inc. v. Q Ill Development, LLC*, 2016 IL App (4th) 160271, ¶ 49 ("It has long been the law of the State of Illinois that a party who fails to make an argument in the trial court forfeits the opportunity to do so on appeal"); *Cavalry Portfolio Services v. Rocha*, 2012 IL App (1st) 111690, ¶ 19 ("Rocha presented these arguments for the first time on appeal [from the denial of its section 2-1401 petition to vacate the judgment] and thus they are forfeited."). We consider new arguments on appeal to be a misuse of the resources of the trial and appellate courts and fundamentally unfair to the appellee. *McKay, Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 453 (2007) (the forfeiture doctrine preserves finite judicial resources by creating an incentive for litigants to bring the trial court's attention to alleged errors, thereby giving the court an opportunity to correct its own mistake and it prevents unfair prejudice to an opponent who might have responded with evidence and argument to the contrary); *Daniels v. Anderson*, 162 Ill. 2d 47, 59, 642 N.E.2d 128, 133 (1994) (finding forfeiture because allowing a party to change theories on appeal would weaken the adversarial process and the appellate system and could be prejudicial to the opponent).

¶ 29    Next, J & J mischaracterizes Miller's statements as hearsay testimony, when the attorney was speaking as an officer of the court rather than a witness, and was describing the contents of his client's affidavit. As quoted above, while Judge Paul and Miller were discussing Bingham's affidavit, the judge questioned the attorney about the type of property at issue and its occupancy status, asking, "So is [it Bingham's] opinion as to the time of this affidavit, the property is unimproved, vacant, and abandoned and/or occupied, or to be determined later?." Miller answered

the court, "I talked to him. He believes it's vacant, but not 100 percent. So he didn't want to testify that it was vacant." He wasn't able to get into the property or verify its vacant status so I guess it will have to be determined later." In the January affidavit, Bingham swore in writing that the property was improved for commercial, mixed use, and that it "appeared vacant and unoccupied." Miller summarized for the court's benefit that Bingham's affidavit indicated he was "unable to obtain if anybody was living there at the time or able to contact anybody." This was neither a false nor incorrect summary. Nothing about counsel's answer at the prove up suggested an intent to deceive the court and counsel's answer does not satisfy J & J's burden of proving through clear and convincing evidence that the tax deed was obtained by fraud. *See* 35 ILCS 200/22-45(3) (West 2020).

¶ 30    J & J's next argument concerns the fact that the affidavit does not specify "in what capacity Bingham was signing the affidavit" and that attorney Miller did not inform the court that Bingham was the president of the petitioning corporation and that Miller was the notary. The latter argument about Miller was forfeited because it does not appear in J & J's amended 2-1401 petition. *Vantage Hospitality*, 2016 IL App (4th) 160271, ¶ 49; *Cavalry Portfolio*, 2012 IL App (1st) 111690, ¶ 19. Furthermore, J & J fails to cite any authority that required Bingham or Miller to affirmatively state their relationship to the petitioner and J & J does not explain why the absence of these details is indicative of fraud upon the court.

¶ 31    J & J argues that the affidavit is contrary to section 6-104(h) of the Illinois Public Notary Act, which provides: "No notary public shall be authorized to prepare any legal instrument, or fill in the blanks of an instrument, other than a notary certificate; however, this prohibition shall not prohibit an attorney, who is also a notary public, from performing notarial acts for any document

- 17 -

prepared by that attorney." 5 ILCS 312/6-104 (West 2020). This is another new argument that is forfeited. *Vantage Hospitality*, 2016 IL App (4th) 160271, ¶ 49; *Cavalry Portfolio*, 2012 IL App (1st) 111690, ¶ 19.

¶ 32    Continuing with its arguments about Bingham's affidavit, J & J contends that he made false representations in his statement and deliberately withheld information about his "diligent inquiry and effort" to find and give notice to Gardner as an interested party.

¶ 33    J & J relies on a case in which a tax purchaser withheld from the court the names and addresses that appeared on a quitclaim deed for the property. *Murray*, 67 Ill. App. 3d 122. One person was the lawyer to whom the quitclaim deed had been mailed after it was filed and the other person was the property owner who had been receiving tax bills in the mail for 13 years. *Id.* The tax purchaser kept this and other information from the court, which the court found to be concealment and sufficient evidence of wrongful intent to warrant vacating the tax deed. *Id*. at 131. Had the court known these facts at the time, it would not have granted the tax deed. *Id*. In affirming the decision, the appellate court said, "Where the deed contains information to ascertain [the owner's current address], and the purchaser fails to [act upon it], there is sufficient evidence of bad faith to warrant concluding that the deed was procured by fraud." *Id*. at 132. What makes this case distinguishable here is that there is no indication this tax purchaser withheld any information from the court. The case does not support J & J's fraud argument. J & J also cites cases in which the tax purchaser out and out lied to the court. In *Schott v. Short*, 131 Ill. App. 2d 854, 860 (1971), the tax purchaser falsely testified that he personally served a person whom he had never actually seen, and in *Giordano v. Trzaska*, 2014 IL App (2d) 130778-U, ¶ 22, the tax purchaser made a number of false statements in his affidavit. The falsehoods included that he

inquired at the applicable addresses when he actually made no effort to obtain addresses from the county tax collector, the county recorder of deeds, and the face of the deed itself; and he abandoned what appeared to be a productive Internet search, because the website charged a fee. *Id*. Nothing of this nature, however, occurred through Bingham's affidavit or Miller's statements during the prove up.

¶ 34    There is no suggestion of any omission or falsehood to Judge Paul. Nevertheless, J & J relies on these cases to support its argument that Bingham deliberately withheld information about his diligence in locating the owner and interested persons and made false representations about those details in his affidavit. J & J argues that instead of relying on the title insurer's research, Bingham should have personally scrutinized the 2016 quitclaim and conducted his own Internet research. J & J contends that the quitclaim disclosed that 352 and 354 had been deeded together, and thus 352 would have been a lead to locating Gardner; and also disclosed the name of the deed recipient's attorney which would have been a lead to pursue with the bar association. J & J also contends that it was easily found on the Internet. In other words, J & J is arguing that it was not reasonable for Bingham to rely on the names and addresses that were reported by the professional title searcher; the "Agent Information" that Gardner provided to the Secretary of State and then failed to update for two if not three years; or the proof of certified mail delivery upon which postal workers wrote "COVID 19" instead of obtaining recipient signatures during the pandemic. The fact that additional information might have been found is not the standard of reasonableness. The tax purchaser was required to make diligent inquiry and effort to find the owner and all parties interested in the real estate. *D.S. Associates*, 278 Ill. App. 3d at 171-72. The record of Cortezz's reliance on the title insurer, the corporation database maintained by the Secretary of State, and the

postal service does not indicate that the circuit court should have determined that Cortezz disregarded its obligations here. After the notice service period, Gardner updated the corporation database with his own contact information, but Judge De La Cruz found that notice had been directed to the correct address and there was no wrongful intent. The record does not substantiate that Cortezz acted to deceive Judge Paul about its diligence in finding and serving 354's owner and interested parties.

¶ 35    Then there is J & J's contention that the order on appeal "makes no mention of the fact[s]" that 1) Miller did not tell Judge Paul that 352 and 354 comprised a single building, 2) Miller did not tell Judge Paul that J & J was a not-for-profit corporation, 3) Gardner testified truthfully at the 2-1401 evidentiary hearing that 352 and 354 each had a mailbox/mail slot and Bingham testified falsely at the hearing that there were no mailboxes, 4) Gardner testified that he learned of the proceedings in April 2022 when court documents were delivered without postage to 354's mailbox, and 5) Gardner's affidavit indicated he spoke with Bingham once at the property, but Bingham's "incredible" testimony was that he did not know who Gardner was until their introduction during the post-judgment "walk through." Only the third point, regarding Bingham's testimony about the lack of a mailbox at 354 would seem to be salient as to whether there was deception about the ability to make contact with the owner and interested parties. However, J & J is asking us to second guess the circuit court's determination of Bingham's credibility, which we are incapable of doing from the cold record. *Murray*, 67 Ill. App. 3d at 132 ("The trial court here heard and saw the witnesses and determined their credibility."). Even if we could, our determination that there was in fact a mailbox at 354 would be an insufficient basis upon which to find that the denial of the 2-1401 petition was an abuse of discretion.

¶ 36     J & J also argues that if Miller had told Judge Paul that Schroeder was a lawyer, then the judge "could have" given instructions to track down the attorney. J & J contends that knowing this fact might have changed Judge Paul's ruling. This is rank speculation and ultimately we disagree that this detail would have changed the outcome of the prove up and justifies our reversal.

¶ 37     J & J next contends that Intaxx's notice of the prove up was deficient because it did not state J & J's name and address and therefore "failed to comply with Illinois Supreme Court Rule 105(a)-(d) and Cook County Rule 2.1" concerning notices. J & J points out that the order on appeal "does not mention" this detail. We find this is a new argument on appeal rather than one that should have been addressed in the order on appeal. In the "Relevant Facts" section of its amended petition, J & J stated, "24. The notice of hearing filed by Petitioner concerning the October 28, 2021, prove-up failed to contain any of Respondent's information and the Respondent was not aware of the date of prove-up and was not present at the prove-up. (*See*, Exhibit 5)." In its "Argument" section, J & J did not elaborate on this fact or cite either of the two rules it now cites on appeal. This new argument was forfeited. *Vantage Hospitality Group*, 2016 IL App (4th) 160271, ¶ 49; *Cavalry Portfolio Services*, 2012 IL App (1st) 111690, ¶ 19.

¶ 38     Finally, the circuit court wrote in part, "And while this court did not find Mr. Bingham to be the most forthright or even credible witness during the evidentiary hearing for the Amended 2-1401 Petition to Vacate, it does not find that fraud was made upon Judge Paul." J & J argues that the court should have identified its specific concerns about Bingham and then found that the tax deed had been procured by fraud. J & J cites no authority that required the circuit court to elaborate on why it deemed Bingham to be an unsatisfactory witness. More importantly, Judge De La Cruz's negative impression of Bingham at the 2-1401 hearing does not mean that J & J met its burden of

- 21 -

presenting clear and convincing evidence that the tax deed was procured by deceiving Judge Paul in the earlier proceeding.

¶ 39   For all these reasons, the judgment of the circuit court is affirmed.

¶ 40   Affirmed.